**Aubrey Lynn SHAW**

v.

**STATE of Alabama.**

**CR–10–1502.**

Court of Criminal Appeals of Alabama.

July 18, 2014.

Opinion on Return to Remand
April 17, 2015.

Rehearing Denied July 2, 2015.

Certiorari Denied April 22, 2016
Alabama Supreme Court 1141089.

---

Angela Setzer, Bryan A. Stevenson, Randall S. Susskind, and Jennae R. Swiergula, Montgomery, for appellant.

Luther Strange, atty. gen., and James C. Crenshaw and Kristi Deason Hagood, asst. attys. gen., for appellee.

JOINER, Judge.

Aubrey Lynn Shaw was convicted of murdering 83–year–old Doris Gilbert and 79–year–old Robert Gilbert during the course of a burglary and pursuant to one act or course of conduct, offenses defined as capital by §§ 13A–5–40(a)(4) and 13A–5–40(a)(10), Ala.Code 1975, respectively. The jury, by a vote of 10 to 2, recommended that Shaw be sentenced to death. The circuit court followed the jury's recommendation and sentenced Shaw to death.

The State's evidence tended to show that on August 20, 2007, police were dispatched to the Gilberts' residence in the Gilbert Stables community after receiving a 911 emergency telephone call concerning a possible double homicide. David James Melton, a law-enforcement officer with Blakeley State Park, testified that he was working patrol on the morning of August 20, 2007, and was dispatched to the Gilberts' house, that he was the first to enter the house, that the door was unlocked, and that when he entered the house he found Doris Gilbert's body lying face up on the bed and Robert Gilbert's body lying face down on the floor near the bed. Dr. F. John Krolikowski, a medical examiner for the State of Alabama, testified that the victims had a total of 50 stab wounds to their bodies, that Doris had 18 stab wounds, and that Robert had 32 stab wounds. The Gilberts, Dr. Krolikowski said, both died as a result of "multiple sharp force injuries." (R. 1234.)

Tera Orellana, a neighbor of the Gilberts, testified that on the morning of August 20, 2007, Joanne Shaw—Shaw's mother—knocked on Orellana's door and asked her to come across the street and talk with Shaw because, she said, something "terrible had happened." When Orellana entered Joanne's house, Orellana said, Shaw said to her: "I killed two people." (R. 1000.) Orellana said that she asked who he had killed, and he looked out the window and gestured towards the Gilberts' house. (Joanne's house was approximately 50 yards from the Gilberts' house.) Orellana testified that Shaw kept repeating: "I f – – – ed up." He asked her to give him a ride, and she left, she told him, to get her keys. Orellana then called one of her neighbors, Karen Rivers, and Rivers called emergency 911. Orellana said that, on the morning of August 20, 2007, Shaw appeared to be "high," was sweating, and was wearing a muscle shirt, shorts, and tennis shoes. She did not notice any blood on him or on the clothing he was wearing.

Herald L. Drake testified that he was the Gilberts' caretaker and that he lived in a trailer behind their house. He said that on August 19, 2007, Shaw came by his residence at around 8:30 p.m. and asked him for $20. He told Shaw that he did not have any money. Drake said that about five minutes later Shaw came back and again asked for $20 but that he did not give Shaw any money. Drake also testified that Robert Gilbert kept a .357 Magnum gun on his bedside table and a .38 caliber Charter Arms revolver in the living room. Testimony showed that, after the Gilberts were killed, those two guns were missing from the Gilberts' residence.

James Watson testified that Shaw came by his house on August 19, 2007, and stayed three or four hours, that he left and came back at around 1:00 a.m. on the morning of August 20, that he asked to

borrow a T-shirt, that he asked if Watson knew anyone who was interested in buying a .357 Magnum gun, and that Shaw stayed the night at his house.

Corporal Charles Nathaniel Bailey, Jr., a crime-scene investigator with the Mobile County Sheriff's Department, testified that he collected numerous items at or near the scene of the murders. He said that, approximately 1,500 feet from the Gilberts' driveway, police discovered an NBA T-shirt that appeared to have blood on it, that a Charter Arms gun was found about 1,200 feet from the victims' driveway, and that north of the driveway he found a Ruger .357 Magnum revolver. A steak knife was also recovered near the Gilberts' residence, and it appeared to have blood on it. Bailey testified that he took several swabs of the substance on the knife and sent the swabs to the Department of Forensic Sciences to be tested. Forensic tests revealed the presence of Robert Gilbert's blood on the recovered knife.

Richard Cayton, a deputy with the Mobile County Sheriff's Department, testified that he assisted in apprehending Shaw, that Shaw was arrested within hours of police discovering the Gilberts' bodies, and that Shaw was found in his mother's house halfway under a bed. Shaw was wearing no shirt or shoes and had what appeared to be blood stains on his socks and pants. A pair of Nike tennis shoes were in the room where he was arrested, and those shoes had what appeared to be blood on them. Forensic tests revealed that the substance on the socks and the tennis shoes was blood and that the blood was consistent with Robert Gilbert's DNA. The tread pattern on those shoes matched the pattern that was left by bloody shoe prints in the Gilberts' garage.

No witnesses testified in Shaw's defense. Shaw's main defense was that he was so intoxicated at the time of the murders he was unable to form the specific intent to kill. Shaw also argued that the State had failed to prove that the murders occurred during the course of a burglary because, he said, he was welcome in the Gilbert house.

The jury convicted Shaw of four counts of capital murder as charged in the two indictments. After a penalty-phase hearing, the jury recommended, by a vote of 10 to 2, that Shaw be sentenced to death. The circuit court followed the jury's recommendation and sentenced Shaw to death. This appeal, which is automatic in a case involving the death penalty, followed. *See* § 13A–5–53, Ala.Code· 1975.

### Standard of Review

Many of the issues that Shaw raises in his brief on appeal were not raised in the circuit court. Rule 45A, Ala. R.App. P., however, requires this Court to review the circuit court proceedings for "plain error." That rule states:

> "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any *plain error* or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

(Emphasis added.)

■ In discussing the scope of plain-error review, this Court, in *Hall v. State,* 820 So.2d 113 (Ala.Crim.App.1999), stated:

> "Plain error is defined as error that has 'adversely affected the substantial right of the appellant.' The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Su-

preme Court stated in *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is 'particularly egregious' and if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See *Ex parte Price*, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); *Burgess v. State*, 723 So.2d 742 (Ala.Cr. App.1997), aff'd, 723 So.2d 770 (Ala. 1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); *Johnson v. State*, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."

820 So.2d at 121–22. " 'The plain error exception to the contemporaneous objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).[1]

### *Guilt–Phase Issues*

### I.

■ Shaw first argues that the circuit court erred in admitting into evidence a portion of his statement to police.[2] Specifically, he contends that the State failed to show that this statement was voluntary or that he had waived his *Miranda*[3] rights.

The record reflects that before trial Shaw moved to suppress his statements to police. In that motion, Shaw argued that the statements he made to police should be suppressed because, he said, they were taken in violation of his right against self-incrimination and his right to counsel. (C. 162.) A hearing was held on the motion. (C. 69–87.) The circuit court found that Shaw invoked his right to counsel and that any statements he made after invoking that right were not admissible. (C. 171.) That portion of Shaw's statement that was made before Shaw invoked his right to counsel was admitted without objection from Shaw. (R. 1140.) Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

On appeal, Shaw argues for the first time that the circuit court erred in admitting the portion of his statement that occurred before he invoked his right to counsel because, he argues, statements made by Det. Don Gomien of the Mobile County Sheriff's Department rendered Shaw's statement involuntary. Det. Gomien said the following to Shaw:

> "There's a lot of questions to be asked and a lot of answer[s] we need and I'm sure you have some questions too. I guarantee if you don't that by the time I get through you'll have some. We need to discuss with you what happened today. Okay and at this point you've got to understand that we're detectives and we're going to ask you these questions and that's why we read you that form right there, that's all."

(C. 253.) Shaw asserts that Det. Gomien's comments communicated to Shaw that he

---

**1.** The Alabama Supreme Court has embraced the federal standard for plain error in death-penalty cases. *See Ex parte Hodges*, 856 So.2d 936, 948 (Ala.2003).

**2.** Although this portion of Shaw's statement did not contain a confession, the State offered it to show Shaw's demeanor and state of mind at the time of his arrest.

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

had to talk to police "regardless of whether he invoke[d] his *Miranda* rights." (Shaw's brief, p. 41.) He cites the case of *Hart v. Attorney General of Florida,* 323 F.3d 884 (11th Cir.2003), to support his assertions.

In *Hart,* the United States Court of Appeals for the Eleventh Circuit held that Hart's statement to police was involuntary because police told him that "honesty wouldn't hurt him," a statement, the court said, that contradicted the *Miranda* warnings that had been given to Hart. No such contradictory statements were made in this case.

Michael McLean, a former homicide detective with the Mobile County Sheriff's Department, testified that he interviewed Shaw with Det. Gomien after Shaw had been arrested and brought to the police station. McLean said that he read Shaw his *Miranda* rights and that Shaw signed the waiver-of-rights form. (R. 1137; C. 447.) A transcript of the statement shows that Shaw initially indicated that he did not want to sign the waiver-of-rights form, that he needed to read it before he signed it, and that he then signed the waiver-of-rights form after reading it. (C. 450.) McLean testified that Shaw did not appear to be under the influence of any substance, that Shaw appeared to understand what was happening, and that he made no promises or inducements to Shaw in order to obtain a statement.

In evaluating a circuit court's ruling admitting a defendant's statement to law enforcement, we apply the standard articulated by the Alabama Supreme Court in *McLeod v. State,* 718 So.2d 727 (Ala.1998):

"For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. *Ex parte Singleton,* 465 So.2d 443, 445 (Ala. 1985). The initial determination is made

by the trial court. *Singleton,* 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. *Marschke v. State,* 450 So.2d 177 (Ala.Crim.App. 1984)....

"The Fifth Amendment to the Constitution of the United States provides in pertinent part: 'No person ... shall be compelled in any criminal case to be a witness against himself....' Similarly, § 6 of the Alabama Constitution of 1901 provides that 'in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.' These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Hubbard v. State,* 283 Ala. 183, 215 So.2d 261 (1968).

"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In *Culombe,* 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, 'if his *will has been overborne* ' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. *Id.* (emphasis added).

"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the 'totality of the circum-

stances.' *Boulden v. Holman,* 394 U.S. 478, 480, 89 S.Ct. 1138, 1139–40, 22 L.Ed.2d 433 (1969); *Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see *Beecher v. Alabama,* 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See *Ex parte Matthews,* 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); *Jackson v. State,* 562 So.2d 1373, 1380 (Ala.Crim. App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); *Eakes v. State,* 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is 'whether the defendant's will was *overborne* at the time he confessed') (emphasis added)."

718 So.2d at 729 (footnote omitted).

We have reviewed the transcript and the videotape of Shaw's statement. The record shows that police read Shaw his *Miranda* rights, that Shaw was asked if he understood those rights, that Shaw was asked if he had any questions, that Shaw indicated that he understood his rights, and that police told Shaw that he did not have to sign the waiver-of-rights form if he did not want to. Shaw then read the waiver-of-rights form containing the *Miranda* rights and signed the form. Several times Shaw indicated that he wanted to "talk" to police.

Based on the totality of the circumstances, we hold that the portion of Shaw's statement that occurred before Shaw invoked his right to counsel was not coerced or the product of misrepresentations and that Shaw voluntarily waived his *Miranda* rights. For these reasons, Shaw is due no relief on this claim.

## II.

■ Shaw next argues that the circuit court erred in failing to conduct an appropriate inquiry into allegations of juror misconduct that occurred during voir dire examination of the prospective jurors.

The record shows that near the conclusion of voir dire prospective juror C.M.[4] informed the circuit court that she had overheard another juror, B.H., make statements about Shaw while she was sitting next to B.H. in the courtroom. The circuit court questioned C.M. about what she had heard, and the following occurred:

"[C.M.]: Wednesday, when you lawyers approached the bench and y'all were discussing some of the questions, the juror to my left, [B.H.], made the comment that, 'He's obviously guilty. What are we doing here? What is he going to tell us? Oops, I didn't mean to?' I felt like that was—obviously, she had already made up her mind. And you had just gotten through asking us to—if you can't get past the—just because he's been arrested and indicted doesn't mean that, you know, he's guilty. That's just the process of the law. And I felt like she would not give a fair, balanced account of the facts given that statement, and I felt like—

"The Court: We needed to know it.

"[C.M.]:—everyone needed to know.

" . . . .

4. To protect the anonymity of the jurors we are using their initials.

"[Defense counsel]: Were there other people that heard that comment?

"[C.M.]: Yes, sir. I believe she said that to—or said some kind of remark to [S.B.] on her other side, but I don't know if [S.B.] would remember or paid any attention to it.

"The Court: Anybody else you think may have heard the remark?

"[C.M.]: I don't know.

"The Court: You were also on the end of the row.

"[C.M.]: Yes, sir. On the back, on the end."

(R. 893–94.) C.M. indicated that she would not discuss the matter with any other prospective juror. Both the prosecutor and defense counsel agreed to remove B.H. for cause based on her comments concerning Shaw's guilt. The circuit court then called S.B. and asked her about what she had heard. S.B. indicated that she had not heard anything specific, only that the prospective jurors had spoken about their obligations. Neither the prosecutor nor defense counsel asked S.B. any more questions. (R. 899.) Shaw made no objection to the circuit court's method of handling the situation. Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P. For the first time on appeal, Shaw argues that the court's method of handling the allegation of juror misconduct was error because, he says, the circuit court's inquiry was not sufficient.

■■■ "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). However, "the trial judge has a duty to conduct a *'reasonable investigation* of irregularities claimed to have been committed' before he concludes that the rights of the accused have not been compromised." *Holland v. State*, 588 So.2d 543, 546 (Ala. Crim.App.1991) (emphasis added).

"What constitutes a 'reasonable investigation of irregularities claimed to have been committed' will necessarily differ in each case. A significant part of the discretion enjoyed by the trial court in this area lies in determining the scope of the investigation that should be conducted.

" 'Th[e] discretion of the trial court to grant a mistrial includes the discretion to determine the extent and type of investigation requisite to a ruling on the motion. *United States v. Flynn*, 216 F.2d 354, 372 (2d Cir. 1954)[, cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955) ]; *Lewis v. United States*, 295 F. 441 (1st Cir.1924)[, cert. denied, 265 U.S. 594, 44 S.Ct. 636, 68 L.Ed. 1197 (1924) ]; *Tillman, [v. United States*, 406 F.2d 930 (5th Cir.), vacated on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969) ]; *Killilea v. United States*, 287 F.2d 212 (1st Cir. 1961)[, cert. denied, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259 (1961) ]; *United States v. Khoury*, 539 F.2d 441 (5th Cir.1976)[, cert. denied, 429 U.S. 1040, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977) ]. A full evidentiary hearing at which witnesses and jurors can be examined and cross examined is not required. *Tillman*, supra, 406 F.2d [at] 938. The trial judge need not examine the juror to determine if that juror admits to being prejudiced before granting a mistrial.'

"*Woods v. State*, 367 So.2d 974, 980 (Ala. Cr.App.), reversed on other grounds, 367 So.2d 982 (Ala.1978), partially quoted in *Cox v. State*, 394 So.2d 103, 105 (Ala.Cr.App.1981). As long as the court makes an inquiry that is reasonable under the circumstances, an appellate

court should not reverse simply because it might have conducted a different or a more extensive inquiry."

*Sistrunk v. State,* 596 So.2d 644, 648–49 (Ala.Crim.App.1992). *See also Gamble v. State,* 791 So.2d 409 (Ala.Crim.App.2000); *Price v. State,* 725 So.2d 1003 (Ala.Crim. App.1997); *Clemons v. State,* 720 So.2d 961 (Ala.Crim.App.1996); *Hamilton v. State,* 680 So.2d 987 (Ala.Crim.App.1996); *Riddle v. State,* 661 So.2d 274 (Ala.Crim. App.1994); and *Hayes v. State,* 647 So.2d 11 (Ala.Crim.App.1994).

∎ "The trial court's decision as to how to proceed in response to allegations of juror misconduct or bias will not be reversed absent an abuse of discretion." *United States v. Youts,* 229 F.3d 1312, 1320 (10th Cir.2000). "[I]t is within the trial court's discretion to determine what constitutes an 'adequate inquiry' into juror misconduct." *State v. Lamy,* 158 N.H. 511, 523, 969 A.2d 451, 462 (2009).

Here, the circuit court questioned C.M. and S.B. about what had occurred and invited the prosecutor and the defense counsel to ask S.B. more questions. C.M. indicated that when B.H. made the statement she was at the end of a row at the back of the courtroom. There was no indication that B.H.'s comments were heard by other prospective jurors. We hold that the circuit court adequately investigated the claim of juror misconduct. Shaw is due no relief on this claim.

## III.

∎ Shaw next argues that the circuit court erred in denying his *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion because, he says, the prosecutor improperly struck black prospective jurors from the jury venire solely on the basis of their race. Specifically, Shaw argues that the State failed to meet its heavy burden of rebutting, he says, his strong prima facie case of discrimination, that the State exercised disparate treatment between the white and black prospective jurors, and that the State improperly relied on demeanor when striking black prospective jurors.

The United States Supreme Court in *Batson* held that it was a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to strike a black prospective juror from a black defendant's jury based solely on their race. This holding was extended to white defendants in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to defense counsel in criminal cases in *Georgia v. McCollum,* 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and to gender-based strikes in *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

∎ Shaw's jury panel was composed of 48 individuals. Of that number, 15 were black prospective jurors. The State used 11 of its peremptory strikes to remove black prospective jurors. Shaw, a white defendant, made a *Batson* objection. The prosecutor then made a reverse *Batson* objection because, he argued, Shaw used all of his strikes but one to remove white males from the panel. The circuit court found that Shaw had established a prima facie case of a *Batson* violation and asked the prosecutor to state his reasons for striking the black prospective jurors. (R. 909.)

"After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. *Batson [v. Kentucky],* 476 U.S. [79] at 97, 106 S.Ct. at 1723 [ (1986) ]. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular

case to be tried, and which is nondiscriminatory. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. [*Ex parte] Jackson*, [516 So.2d 768 (Ala.1986) ]."

*Ex parte Branch*, 526 So.2d 609, 623 (Ala. 1987).

The prosecutor gave the following reasons for striking the black prospective jurors:

— *Prospective Juror S.M. (No. 4):* [5] This prospective juror circled two different answers on her juror questionnaire concerning her views on the death penalty—she indicated both that she was in favor of the death penalty and that she was not in favor of the death penalty. "Her answers were waffling back and forth as it applied to the death penalty.... A lack of commitment to the death penalty." (R. 912.) Also, the prosecutor indicated that this prospective juror "looked put-out to be here." (R. 932.)

— *Prospective Juror M.W. (No. 13):* "[U]nlike any other member of the venire [M.W.] had six prior DUI offenses. And while he said they were not all convictions, he did not disclose several of them." (R. 912.)

— *Prospective Juror M.R. (No. 18):* "She was another one who had convictions that she did not list that involved direct interaction with law enforcement, and that being disorderly conduct and failure to obey that involved no other victims, a police officer saying she did one thing that she said she didn't or may not have done. She has a friend who is in prison for attempted murder, has a son who has had some issues that actually got her involved in the—the offenses." (R. 912–13.)

— *Prospective Juror T.B. (No. 20):* "[T.B.] was waffling all over the death penalty, all in regards to the death penalty. She put on her questionnaire that she—she felt like she shouldn't kill anyone, a lifetime sentence in a proper facility should be a sufficient punishment, and she was struck based on her views on the death penalty. She also checked she is not in favor of the death penalty and that—then she put she could impose the death penalty later." (R. 913.)

— *Prospective Juror T.M. (No. 29):* She indicated that she could not impose the death penalty, that she was the victim of a robbery that had not been solved, and that she had a niece who had "some bad check issues." (R. 913.)

— *Prospective Juror K.S. (No. 47):* "[K.S.] is a corrections officer [at the Mobile County jail] who has the potential for direct contact with the defendant.... He has some specialized knowledge that he felt like he would be able to take back into the jury room. Has a history with a family with problems with drugs." (R. 917.)

— *Prospective Juror B.H. (No. 50):* She has a son who was arrested for loitering, she said that she didn't know anything about that case, she has previously served on a jury in a rape case, "she made statements regarding the defendant in that case, that he had pled guilty, but he didn't have any—quote, he didn't have any choice. She didn't understand why she was there or why they were going through the process," and

---

**5.** S.M. served as an alternate juror. Rule 18.4(g)(3), Ala. R.Crim. P., provides that the last person or persons struck shall be the alternates. For purposes of reviewing a *Batson* claim, we view the alternate jurors as having been struck. *See Ex parte Bankhead*, 625 So.2d 1146, 1147 (Ala.1993).

she has a sister who is member of the police department.[6]

— *Prospective Juror F.C. (No. 54):* She indicated on juror questionnaire that she believed in the death penalty and she indicated that she could never return a verdict of death then changed answers on death penalty during voir dire examination; she was a character witness for a defendant who, she said, was wrongfully charged with child rape.

— *Prospective Juror R.S. (No. 57):* "She said the death penalty was imposed too often. And later, then she said it depends on the case. She had—her best friend is … a woman who killed her boyfriend because he brought a prostitute home. And that was a very close friend. She had lots of details about the case." (R. 919.) She said that she had been to court numerous times with her friend and that her friend had been convicted of killing her boyfriend.

— *Prospective Juror M.D. (No. 59):* She indicated on juror questionnaire that she was not in favor of the death penalty, that she had a moral or religious belief that prevented her from sitting in judgment, and that she believed no one had a right to sentence anyone to death.

— *Prospective Juror O.S. (No. 66):* She had several prior convictions that she did not disclose and two brothers that were in jail for robbery and burglary.[7]

This Court has stated the following concerning the sufficiency of a race-neutral reason:

"Within the context of *Batson,* a 'race-neutral' explanation 'means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). 'In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.' *Id.* '[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within the trial judges's province." ' *Hernandez,* 500 U.S. at 365, 111 S.Ct. at 1869."

*Allen v. State,* 659 So.2d 135, 147 (Ala. Crim.App.1994).

"While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause, *Batson,* 476 U.S., at 97, 106 S.Ct., at 1723, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character."

*Hernandez v. New York,* 500 U.S. 352, 362–63, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

 This Court has repeatedly held that a prospective juror's views on the death penalty are sufficient race-neutral reasons to remove a prospective juror. "A juror's opposition to capital punishment is a sufficiently race-neutral reason to strike a juror." *Smith v. State,* 797 So.2d 503, 522 (Ala.Crim.App.2000). "Strikes based on '[p]revious criminal charges, prosecu-

---

6. Shaw indicated that he intended to strike this juror but that the State struck her before he could. (R. 934.)

7. Shaw indicated that he intended to strike this prospective juror but that the State struck her before he could. (R. 934.)

tions, or convictions of the venire-member or a family member . . .' have been found not to violate *Batson.*" *Knight v. State,* 652 So.2d 771, 773 (Ala.Crim.App.1994). "Age, place of employment and demeanor of the potential juror have been held to be sufficiently race-neutral reasons for exercising a peremptory challenge." *Sanders v. State,* 623 So.2d 428, 432 (Ala.Crim.App. 1993).

> "[W]here the explanation for a peremptory challenge is based on a prospective juror's demeanor, the judge should take into account, among other things, any observations of the juror that the judge was able to make during the voir dire. But *Batson* plainly did not go further and hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor."

*Thaler v. Haynes,* 559 U.S. 43, 48, 130 S.Ct. 1171, 175 L.Ed.2d 1003 (2010).

The record shows that, of the prosecutor's 18 strikes, the prosecutor struck 7 white prospective jurors and 11 black prospective jurors. A review of the prosecutor's striking process shows no evidence of disparate treatment.

The prosecutor's first two strikes were of white jurors. The first strike was prospective juror D.O.—a white female. The prosecutor stated that he struck D.O. because she had a stepson with drug problems, she attended death-penalty protests, she knew a defense witness, and she had a brother involved with drugs.

The prosecutor's second strike was prospective juror A.J.—a white male. A.J. was struck, the prosecutor said, because he was not in favor of the death penalty and had specialized knowledge of the legal system because he was a recent law-school graduate.

The prosecutor then struck prospective juror T.M., a black female, because she indicated that she could not impose the death penalty. A white female, prospective juror L.C., was then struck by the prosecutor for this same reason. " 'Where whites and blacks are struck for the same reason, there is no evidence of disparate treatment.' " *Bush v. State,* 695 So.2d 70, 100 (Ala.Crim.App.1995) (quoting *Carrington v. State,* 608 So.2d 447, 449 (Ala.Crim.App.1992)).

The prospective jurors challenged by Shaw on appeal were struck by the State for multiple reasons.

> "It is well settled that '[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.' *Johnson v. State,* 648 So.2d 629, 632 (Ala.Crim.App.1994). See also *Jackson v. State,* 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); *Brown v. State,* 705 So.2d 871, 874 (Ala.Crim.App.1997); and *Wood v. State,* 715 So.2d 812, 816 (Ala.Crim.App.1996), aff'd, 715 So.2d 819 (Ala.1998). 'Where a prosecutor gives a reason which may be a pretext, . . . but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.' "

*Martin v. State,* 62 So.3d 1050, 1059–60 (Ala.Crim.App.2010).

> "As recently noted by the Court of Criminal Appeals, 'disparate treatment' cannot automatically be imputed in every situation where one of the State's basis for striking a venireperson would technically apply to another venireperson whom the State found acceptable. *Cantu v. State,* 842 S.W.2d 667, 689 (Tex.Crim.App.1992). The State's use of its peremptory challenges is not subject to rigid quantification. *Id.* Potential jurors may possess the same objectiona-

ble characteristics, yet in varying degrees. *Id.* The fact that jurors remaining on the panel possess one or more of the same characteristics as a juror that was stricken, does not establish disparate treatment."

*Barnes v. State*, 855 S.W.2d 173, 174 (Tex. App.1993). *See also Wiggins v. State*, 193 So.3d 765 (Ala.Crim.App.2014).

Shaw argues that there is evidence of disparate treatment because four white prospective jurors—T.P., M.H., C.L., and J.M.—had friends or family members with a criminal history but were not struck. The black prospective jurors that had relatives or friends with prior criminal histories—M.R., T.M., K.S., B.H., and O.S.— were struck for other reasons as well. M.R. had prior convictions; T.M. said she could not impose the death penalty; K.S. was a corrections officer at the Mobile County jail who had "the potential for direct contact with" Shaw; B.H. had served as a juror in a rape case and had a sister who was a member of the police department; and O.S. had several prior convictions.

Shaw also argues that the State removed black prospective jurors based on their views on the death penalty but failed to remove white prospective jurors—T.P. and C.L.—for that reason. As the State asserts in its brief, both white prospective jurors indicated that they could impose the death penalty. The black prospective jurors were not "similarly situated" to the white prospective jurors who were not struck for this reason. *See Wiggins, supra.*

Shaw further argues that although several black prospective jurors indicated that they were opposed to the death penalty, they were subsequently rehabilitated during voir dire; thus, he asserts, there were

not sufficient grounds to remove those prospective jurors.

" '[T]hat [the juror] was ultimately "rehabilitated" by the defense did not mean the State had to accept her ambivalent views. See *Vargas v. State*, 838 S.W.2d 552, 555 (Tex.Crim.App.1992). The reason behind peremptory strikes does not have to rise to the level of a challenge for cause to be considered legitimately race-neutral.' "

*Benjamin v. State*, 156 So.3d 424, 433 (Ala. Crim.App.2013) (quoting *Green v. State*, 839 S.W.2d 935, 939 (Tex.App.1992)).

A trial court's ruling on a *Batson* motion is entitled to great deference on appeal. As the United States Supreme Court stated in *Hernandez:*

"Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson,* the finding 'largely will turn on evaluation of credibility.' 476 U.S., at 98, n. 21, 106 S.Ct. at 1724, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985), citing *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984)."

500 U.S. at 365.

We have examined the transcript of the voir dire examination, the juror questionnaires, and the prosecutor's explanations, and we have found nothing to suggest that

the circuit court abused its considerable discretion in denying Shaw's *Batson* motion. Accordingly, Shaw is due no relief on this claim.

### IV.

 Shaw next argues that the circuit court erred in allowing the jury to see a videotape of him handcuffed and in a jail uniform because, he says, it destroyed his presumption of innocence.

 Michael McLean, a former homicide detective with the Mobile County Sheriff's Department, testified that he spoke with Shaw after he was arrested and that Shaw's statement was audiotaped and videotaped. McLean identified State's exhibit number 132 as a copy of the recorded interview with Shaw. Defense counsel specifically stated that he had no objections when this recording was identified and offered into evidence. (R. 1140.) Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

" 'The presumption of innocence, although not articulated in the Constitution, is a basic component of our system of criminal justice.' *United States v. Dawson*, 563 F.2d 149, 151 (5th Cir. 1977) (citations omitted). A court violates that presumption when it 'compels an accused to stand trial before a jury while dressed in identifiable prison garb.' *United States v. Birdsell*, 775 F.2d 645, 652 (5th Cir.1985) However, '[i]f, for whatever reason, the defendant fails to object to this attire, the presence of compulsion necessary to establish a constitutional violation is negated.' *Id.* (citations omitted)."

*United States v. Pena*, 429 Fed.Appx. 405, 406 (5th Cir.2011) (not selected for publication in the *Federal Reporter* ).

"Compelling an accused to stand trial before a jury in prison clothes violates the Fourteenth Amendment; however,

the failure to make a contemporaneous objection to the defendant's appearance negates the presence of compulsion necessary to establish a constitutional violation. *Estelle v. Williams*, 425 U.S. 501, 512–13, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); *United States v. Birdsell*, 775 F.2d 645, 652 (5th Cir.1985), cert. denied, 476 U.S. 1119 (1986)."

*Keller v. Day* (No. 92–3434), 9 F.3d 102 (5th Cir.1993) (table) (not selected for publication in the *Federal Reporter* ).

This Court has recognized that there is a distinction between the jury's observing a defendant wearing handcuffs in the courtroom for his or her trial and the jury's observing the defendant wearing handcuffs in a videotape that is shown to the jury during trial. We have stated:

" ' "The presumption of innocence, although not articulated in the Constitution, is a basic component of our system of criminal justice." *United States v. Dawson*, 563 F.2d 149, 151 (5th Cir.1977) (citations omitted). A government entity violates that presumption of innocence when it "compels an accused to stand trial before a jury while dressed in identifiable prison garb." *United States v. Birdsell*, 775 F.2d 645, 652 (5th Cir.1985).'

"*United States v. Pryor*, 483 F.3d 309, 311 (5th Cir.2007). However, we have not extended the violation of the presumption of innocence to the viewing of the defendant on a videotape while he is in handcuffs. As the United States Court of Appeals for the Eleventh Circuit stated in *Gates v. Zant*, 863 F.2d 1492 (11th Cir.1989):

" 'Gates' other challenge to the videotaped confession is that its admission was unduly prejudicial because it portrayed him in handcuffs.

As we have noted previously, although the handcuffs are not always visible, it is evident throughout the fifteen-minute tape that the defendant is handcuffed. We are aware of no cases which address the propriety of handcuffing during a videotaped confession. Nonetheless, the resolution of the issue is apparent from earlier cases addressing handcuffing in and around trials.

" 'The principal difficulty arising from shackling or handcuffing a defendant at trial is that it tends to negate the presumption of innocence by portraying the defendant as a bad or dangerous person. The Supreme Court has referred to shackling during trial as an "inherently prejudicial practice" which may only be justified by an "essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). See also *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). This court recently has extended the general prohibition against shackling at trial to the sentencing phase of a death penalty case. *Elledge v. Dugger*, 823 F.2d 1439, 1450–52 (11th Cir. 1987), modified, 833 F.2d 250 (1987), cert. denied, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).

" 'On the other hand, a defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. *Allen v. Montgomery*, 728 F.2d 1409, 1414 (11th Cir.1984); *United States v. Diecidue*, 603 F.2d 535, 549–50 (5th Cir.1979), cert. denied sub nom. *Antone v. United States*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); *Wright v. Texas*, 533 F.2d 185, 187–88 (5th Cir.1976); *Jones v.*

*Gaither*, 640 F.Supp. 741, 747 (N.D.Ga.1986), aff'd without opinion, 813 F.2d 410 (11th Cir.1987). The new fifth circuit is among those circuits which adhere to this rule. *King v. Lynaugh*, 828 F.2d 257, 264–65 (5th Cir.1987), vacated on other grounds, 850 F.2d 1055 (5th Cir.1988); see also *United States v. Williams*, 809 F.2d 75, 83–86 (1st Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1959, 2469, 2484, 95 L.Ed.2d 531, 877, 96 L.Ed.2d 377 (1987); *United States v. Robinson*, 645 F.2d 616, 617–18 (8th Cir. 1981), cert. denied, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). In these latter cases, the courts generally have held that the defendant must make some showing of actual prejudice before a retrial is required.

" 'Thus, the case law in this area presents two ends of a spectrum. This case falls closer to the "brief viewing" end of the spectrum and requires a showing of actual prejudice before a retrial is required. The prosecution showed the fifteen-minute tape twice during several days of trial. The handcuffs were only visible during short portions of the tape.

" 'Gates has made no attempt to show that he suffered actual prejudice because the jury saw him in handcuffs. Our independent examination of the record also persuades us that he did not suffer any prejudice. Although defense counsel strenuously objected to the admission of the videotape, he did not object to the handcuffing in particular. He did not ask for a cautionary instruction or a poll of the jury. Furthermore, the videotape at issue here was taken at the scene of the crime, not at the police station. Thus, jurors likely would infer that handcuffing was simply stan-

dard procedure when a defendant is taken outside the jail. The viewing of the defendant in handcuffs on television rather than in person further reduces the potential for prejudice. In light of the foregoing facts, and the fact that Gates sat before the jury without handcuffs for several days during his trial, we conclude that the relatively brief appearance of the defendant in handcuffs on the videotape did not tend to negate the presumption of innocence or portray the defendant as a dangerous or bad person. We therefore conclude on the particular facts of this case that the handcuffing of Gates during the videotaped confession does not require a new trial.'

"863 F.2d at 1501–02. See also *Barber v. State,* 952 So.2d 393 (Ala.Crim.App. 2005)."

*Doster v. State,* 72 So.3d 50, 85–86 (Ala. Crim.App.2010). *See Black v. State,* 120 So.3d 654, 655 (Fla.Dist.Ct.App.2013) ("[W]e are persuaded that the trial court's decision allowing the state to present to the jury both the audio and visual portions of appellant's brief, videotaped police interview, in which appellant could be seen wearing a jail uniform, handcuffs, and leg chains, was not an abuse of the trial court's discretion.").

We have examined the videotape of the interview. The beginning of the videotape shows Shaw entering an interrogation room wearing a white jumpsuit. He is handcuffed and the handcuffs are visible as he enters and sits down at a table. For the majority of the interview Shaw has his hands in his lap, under the table, or he is holding his hands together—the handcuffs are not clearly visible the entire interview. The white jumpsuit that Shaw is wearing has no visible writing on it but has a round blue circle on the front. There is no indi-

cation that the jumpsuit is a "jail uniform." The videotape also shows that Shaw is not wearing shoes. The entire videotape lasts approximately 12 minutes. Our review of the record shows no indication that the jury's observance of Shaw wearing handcuffs in the videotape "adversely affected [Shaw's] substantial rights." Accordingly, we find no plain error in regard to this claim—Shaw is due no relief.

## V.

■ Shaw next argues that the circuit court erred in allowing the hearsay statements of Shaw's mother to be admitted during Tera Orellana's testimony. Specifically, Shaw argues that the admission of those statements violated his rights to confrontation, cross-examination, due process, and a fair trial.

The record shows that Orellana, a neighbor of the victims, testified as to what occurred on the morning after the murders:

"[Prosecutor]: Do you remember the morning of August 20, 2007?

"[Orellana]: Yes, ma'am.

"[Prosecutor]: How do you remember that?

"[Orellana]: I remember it being a horrible—one of the most horrible mornings I've ever had in my life.

"[Prosecutor]: What happened?

"[Orellana]: I got a knock on the door, and it was Miss Joanne [Shaw's mother].

". . . .

"[Orellana]: But Miss Joanne come over and asked me could I walk across the street with her; that there was somebody—that Lynn—we call Aubrey Lynn, and she asked me that Lynn needed somebody to talk to. Could I come over there with them—with her,

*that something horrible had happened, and he needed to talk to somebody."* (R. 998–99) (emphasis added). Shaw did not object to the above statement; therefore, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P. On appeal, Shaw argues that the emphasized portion of Orellana's testimony was hearsay and inadmissible.

 "Hearsay" is defined in Rule 801(c), Ala. R. Evid., as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

"A statement offered for some purpose other than to prove the truth of its factual assertions is not hearsay. *Bryant v. Moss,* 295 Ala. 339, 342, 329 So.2d 538 (1976). See also *Cory v. State,* 372 So.2d 394 (Ala.Cr.App.1979); *Epps v. State,* 408 So.2d 562, 564 (Ala.Cr.App. 1981). Thus, 'utterances offered for some purpose other than to prove the truth of the out of court declaration fall outside the rule.' *Ex parte Bryars,* 456 So.2d 1136, 1138 (Ala.1984). Where the statement's value does not depend upon its truth, its admission would not violate the hearsay rule. See E. Cleary, *McCormick's Handbook on the Law of Evidence* (2d ed. 1972), § 249, at page 590. Thus, a statement may be admissible where it is not offered to prove the truth of whatever facts might be stated, 'but rather to establish the reason for action or conduct by the witness.' *Tucker v. State,* 474 So.2d 131, 132 (Ala.Cr. App.1984), rev'd on other grounds, 474 So.2d 134 (Ala.1985). See also *Tillis v. State,* [469 So.2d 1367 (Ala.Crim.App. 1985) ]."

*Edwards v. State,* 502 So.2d 846, 849 (Ala. Crim.App.1986).

In *Sawyer v. State,* 598 So.2d 1035 (Ala. Crim.App.1992), this Court explained:

" 'A statement may be admissible where it is not offered to prove the truth of whatever facts might be stated, "but rather to establish the reason for action or conduct by the witness [when the reason for the action or conduct is relevant to an issue at trial]." ' *Edwards v. State,* 502 So.2d 846, 849 (Ala.Cr.App. 1986) (quoting *Tucker v. State,* 474 So.2d 131, 132 (Ala.Cr.App.1984), rev'd on other grounds, 474 So.2d 134 (1985)). The officers related information obtained from other sources to explain why they proceeded as they did. This was not hearsay. See, e.g., *Brannon [v. State* ], 549 So.2d [532] at 539 [ (Ala.Crim.App. 1989) ]; *McCray v. State,* 548 So.2d 573, 576 (Ala.Cr.App.1988). See, also, *Molina v. State,* 533 So.2d 701, 714 (Ala.Cr. App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989); *Tillis v. State,* 469 So.2d 1367, 1370 (Ala. Cr.App.1985)."

598 So.2d at 1038.

Joanne Shaw's statements to Orellana were not offered to prove their truth but were offered to show why Orellana went to Joanne's house to speak with the defendant. Thus, those statements were not offered to prove the truth of the matter asserted and by definition were not hearsay. *See* Rule 801(c), Ala. R. Evid.

Moreover, even if the statements were hearsay, any possible error in their admittance was harmless beyond a reasonable doubt. *Belisle v. State,* 11 So.3d 256, 299 (Ala.Crim.App.2007). Orellana testified to the admission that Shaw made to her—he told her that he had killed two people. For these reasons, we find no error, much less plain error, in regard to this claim. Shaw is due no relief.

## VI.

Shaw next argues that the State failed to establish a proper chain of custody for

several exhibits introduced by the State. Specifically, he argues that the State violated *Ex parte Holton,* 590 So.2d 918 (Ala. 1991), because it failed to identify each link in the chain of custody for each of the challenged items.

The Alabama Supreme Court, in *Ex parte Holton, supra,* stated the following concerning a proper chain of custody:

"The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, *The Identification of Original, Real Evidence,* 61 Mil. L.Rev. 145, 159 (1973)."

590 So.2d at 919–20.

After the Supreme Court's decision in *Ex parte Holton,* however, the Alabama Legislature adopted § 12–21–13, Ala.Code 1975, effective August 7, 1995. That statute provides:

"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."

Subsequent to the adoption of § 12–21–13, Ala.Code 1975, the Supreme Court in *Hale v. State,* 848 So.2d 224 (Ala.2002), discussed the application of § 12–21–13:

"This statute, by its terms, applies only to '[p]hysical evidence connected with or collected in the investigation of' the charged crime. To invoke the statute the proponent of the evidence must first establish that the proffered physical evidence is in fact the very evidence 'connected with or collected in the investigation.' Moreover,

" '[i]n *Land v. State,* 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.1996), a case which appears to rely on § 12–21–13, this court ruled that where a witness can specifically identify the evidence, and *its condition is not an issue in the case, then the State is not required to establish a complete chain of custody* in order for the evidence to be admitted into evidence. We stated: 'The eyeglasses were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case.' *Land,* 678 So.2d at 210 . . . .' "

848 So.2d at 228–29. *See also Morales v. State,* 286 Ga.App. 698, 703, 649 S.E.2d 873, 878 (2007) ("Items of evidence which are distinct and recognizable physical objects, such that they can be identified by the sense of observation, are admissible into evidence without the necessity of showing a chain of custody."); *People v. Hill,* 220 A.D.2d 927, 928, 632 N.Y.S.2d 881, 882 (1995) ("[S]trict proof of the chain of custody was not required because clothing is not fungible . . . ."); and *Hutchinson v. State,* 477 N.E.2d 850, 853 (Ind.1985) ("[N]on-fungible items do not require this high degree of scrutiny that must be applied to fungible items . . . . In addition, a

non-fungible item may be admitted into evidence based upon testimony that the items is the one in question and is in a substantially unchanged position.").

In *Ex parte Mills,* 62 So.3d 574 (Ala. 2010), the Alabama Supreme Court considered a chain-of-custody challenge on appeal to determine whether the admission of certain items into evidence at trial, without objection, constituted "plain error." The court stated:

> "Mills did not challenge the chain of custody as to any of the now-challenged items at trial. Unlike *Birge [v. State,* 973 So.2d 1085 (Ala.Crim.App.2007) ], in which evidence indicated that several different unidentified individuals could have handled the specimens and there were discrepancies in the records about the specimens, nothing in the present case indicates that the items were tampered with or altered in any manner from the time [law enforcement] relinquished custody of them to DFS [the Department of Forensic Sciences] until the time Bass tested them at DFS. Mills also has made no 'showing of ill will, bad faith, evil motivation, or some evidence of tampering' while the items were at DFS. *Lee [v. State*], 898 So.2d [790] at 847 [ (Ala.Crim.App.2001) ]. Thus, this link, at worst, is a 'weak' link rather than a 'missing' link in the chain of custody."

62 So.3d at 598. "[E]vidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item." *Lane v. State,* 644 So.2d 1318, 1321 (Ala.Crim.App.1994).

This Court has also stated the following concerning evidence that is "routinely handled by governmental officials":

> " ' "Tangible evidence of a crime is admissible when shown to be 'in substantially the same condition as when the crime was committed.' And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved '[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering.' If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.
>
> " ' "The undertaking on that score need not rule out every conceivable chance that somehow the [identity] or character of the evidence underwent change. '[T]he possibility of misidentification and adulteration must be eliminated,' we have said, 'not absolutely, but as a matter of reasonable probability.' So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances." ' "

*Moorman v. State,* 574 So.2d 953, 956–57 (Ala.Crim.App.1990) (quoting *United States v. Roberts,* 844 F.2d 537, 549–50 (8th Cir.1988), quoting in turn *United States v. Anderson,* 654 F.2d 1264, 1267 (8th Cir.1981), quoting in turn *United States v. Lane,* 591 F.2d 961 (D.C.Cir. 1979)). *See Lee v. State,* 898 So.2d 790, 847–48 (Ala.Crim.App.2001).

> "Although the ideal practice would be for one person to maintain exclusive and constant control of the [evidence], these rules are made for practical people who deal with such evidence as part of day to day routine. The chain of custody requirements aim at a 'reasonable probability' that there has been no tampering; they are not intended as an obstacle course or a walk through a legalistic mine field."

*Blanco v. State*, 485 So.2d 1217, 1220 (Ala. Crim.App.1986). "The totality of the circumstances test is applied to alleged deficiencies in a chain of custody." *Whitt v. State*, 733 So.2d 463, 473 (Ala.Crim.App. 1998).

This Court has also recognized that the admission of evidence without a proper chain of custody may constitute harmless error. *See Brannon v. State*, 61 So.3d 1100, 1103 (Ala.Crim.App.2010).

With these principles in mind, we review each challenged item of evidence.

### A.

■■■ First, Shaw argues that the State failed to establish a proper chain of custody for the blood-identification, or bloodstain, cards relating to the victims, State's exhibits 127 and 128. At the time State's exhibits 127 and 128 were admitted, Shaw made no objections. Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

Dr. F. John Krolikowski, the medical examiner who performed the autopsies on the two victims, testified:

"[Prosecutor]: Did you also, as part of your autopsy, take bloodstain cards from the victim?

"[Dr. Krolikowski]: Yes. As a routine part of our examination, we take a piece of specially treated material and put drops of blood on it for future use in an investigation of a given case, and these blood drops contain the DNA that can be used to identify the decedent.

"[Prosecutor]: All right. Dr. Krolikowski, I'm showing you what we already have admitted as State's Exhibit No. 127 and 128. Are those the bloodstain cards that you took from Robert and Doris Gilbert?

"[Dr. Krolikowski]: Yes. On the back are my initials and the date which I personally inscribed and had placed on these envelopes."

(R. 1201–02.) Patrick Goff, a forensic scientist with the Alabama Department of Forensic Sciences, testified that he processed the samples on the bloodstain cards that had been collected at the time of the autopsies, that the cards were marked as State's exhibits 127 and 128, and that he obtained DNA for both victims from those cards. The exhibits reflect that Dr. Krolikowski's initials are on the back of each bloodstain card, and he identified the cards as having been prepared by him. There is no indication from Goff's testimony that the cards had been altered or tampered with in any way.

Shaw has made no "showing of ill will, bad faith, evil motivation, or some evidence of tampering" regarding the cards while they were in State custody. *Lee*, 898 So.2d at 847. Shaw has failed to "explain[ ] how he has been denied a substantial right or how the failure to show a chain of custody for the [bloodstain cards] has affected the fairness and integrity of his trial so as to rise to the level of plain error." *Lee*, 898 So.2d at 850. Accordingly, we find no plain error in regard to the admission of this evidence. Shaw is due no relief on this claim.

### B.

■■■ Shaw next argues that the State failed to present a proper chain of custody for the shoes that were admitted as State's exhibit 123. Shaw did not object to the admission of that exhibit and, in fact, specifically stated that he had no objection. (R. 1116.) Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

Daniel Earl Holifield, a deputy with the Mobile County Sheriff's Department, testified that he collected evidence at the location where Shaw was arrested. He said

that photographs were made of the bedroom where Shaw was found, that a pair of shoes were found in that bedroom, that the shoes were size 10 1/2 gray Nike tennis shoes, that he collected those shoes, that the shoes appeared to have blood on them, and that he put the shoes in a brown evidence bag and secured the bag with evidence tape. (R. 1115.) Holifield identified State's exhibit 123 as the shoes that he collected at the time of Shaw's arrest. Photographs of the shoes were also admitted at trial. Patrick Goff testified that the shoes were given an identification number when they arrived at the Department of Forensic Sciences and that he tested the substances on the shoes. He said that he found Robert Gilbert's blood on one of the shoes. The record contains no suggestion that the shoes were tampered with or altered in any way.

The Supreme Court of Georgia recently addressed a similar issue and stated:

"The blood-stained shoes were distinct and recognizable objects, identified by the detectives who seized them and the serologist at the forensic laboratory who received them; there is no merit to a chain of custody objection on the ground that there was not testimony from every person with custody of the shoes before they were delivered to the laboratory. *Felton v. State*, 283 Ga. 242, 246(2)(b), 657 S.E.2d 850 (2008)."

*Walker v. State*, 294 Ga. 851, 853, 757 S.E.2d 64, 67 (2014). *See also People v. Morris*, 997 N.E.2d 847, 864, 375 Ill.Dec. 536, 553 (2013) ("Because the State sufficiently laid a foundation for the pants and boots, it was not required to establish a chain of custody for the evidence to be admissible, and the trial court did not err when it allowed the items into evidence...."); *State v. Sutton*, 320 S.W.3d 729, 734 (Mo.Ct.App.2010) ("When an exhibit is clearly identified at trial even as modified as the exhibits here were by the officers cutting out patches, chain of custody is irrelevant.").

The shoes were properly admitted into evidence after they were specifically identified as the shoes that were seized when Shaw was arrested. We find no error, much less plain error, in regard to this issue.

C.

■ Shaw further argues that the State failed to prove a proper chain of custody for the socks that were seized at the police station. A review of the record shows that the socks were not admitted into evidence but that the results of the forensic tests conducted on the socks were admitted.

When the exhibit containing the test results was discussed at trial, Shaw did not object. Thus, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

Corporal Charles Nathaniel Bailey, Jr., a crime-scene investigator with the Mobile County Sheriff's Department, testified that he collected the clothing that Shaw was wearing at the time Shaw was taken into police custody and that he placed the clothing in a sealed bag and sent that bag to the Department of Forensic Sciences. He identified State's exhibit 131 as the bag that he had used to collect the clothing.

Patrick Goff, a forensic scientist with the Alabama Department of Forensic Sciences, testified that he tested the socks that he received from the Department of Forensic Sciences. He found Robert Gilbert's blood on the socks.

Again, Shaw has made no allegation that the socks were tampered with in any way, and there is no indication in the record that the socks were altered. Although the socks were not admitted into evidence, the results of the forensic tests conducted on

the socks were admitted. Any error in admitting testimony concerning the socks or in admitting the forensic tests conducted on the socks was, at most, harmless beyond a reasonable doubt. *See Brannon, supra.*

### D.

■ Shaw next argues that the State did not present a proper chain of custody for the swabs that were collected from the knife recovered near the murder scene—State's exhibit 129.

At the time the swabs were received and admitted into evidence, Shaw did not object and, in fact, stated that he had no objection. (R. 1082.) Accordingly, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

Frederick Reed, a crime-scene investigator with the Mobile County Sheriff's Department, testified that he collected a knife near the murder scene, that he placed the knife in an evidence bag, and that he gave the bag and knife to Charles Bailey. Bailey, the lead crime-scene investigator on the case, testified that, after he received the knife from Reed, he processed the knife for fingerprints and swabbed the blade for the presence of blood. (R. 1080–81.) No fingerprints were found on the knife. Bailey identified State's exhibit 129 as the two swabs that he collected from the knife and turned into the Department of Forensic Sciences in a sealed envelope or container, and Bailey testified that the exhibit was in substantially the same condition as when he had processed it. Patrick Goff testified that he received the swabs and tested them and found the presence of Robert Gilbert's blood.

■ Shaw has made no showing of "ill will, bad faith, evil motivation, or some evidence of tampering." *Lee,* 898 So.2d at 847.

"Circumstantial evidence is generally sufficient to authenticate the item sought to be entered into evidence, except when there appears to be evidence that the item of evidence was tampered with or that a substitution was made while the item was in the custody of the link who has failed to appear and testify."

*Ex parte Holton,* 590 So.2d at 920.

Here, the circumstantial evidence was adequate to establish a sufficient chain of custody for the swabs. "[T]he State provided testimony concerning the gathering of this evidence as well as its handling. Any weaknesses in the links of the chains of evidence address weight to be afforded the evidence rather than its admissibility." *Jackson v. State,* 169 So.3d 1, 85 (Ala. Crim.App.2010) (opinion on return to remand). The swabs were properly admitted into evidence at Shaw's trial. There was no error, much less plain error, in the admission of this evidence. Shaw is due no relief on this claim.

### E.

■ Shaw next argues that the State failed to present a proper chain of custody for an NBA T-shirt, recovered approximately 1,500 feet north of the Gilberts' residence and near the .38 caliber Charter Arms gun. The T-shirt was marked and admitted as State's exhibit 130. A picture of the shirt was also admitted as State's exhibit 86.

Shaw stated that he had no objection when this evidence was admitted at trial. Thus, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

Corporal Charles Bailey, a crime-scene investigator with the Mobile County Sheriff's Department, testified that he recovered a NBA T-shirt north of the Gilberts' residence. He identified State's exhibit 130 as the T-shirt that he had collected

near the murder scene and said that it was in substantially the same condition as when he had collected it. Patrick Goff testified that the blood on the T-shirt matched Robert Gilbert's DNA profile. There was no testimony that the T-shirt belonged to Shaw or had any connection to Shaw. Shaw makes no argument that the T-shirt was tampered with or altered in any way.

The T-shirt was identified as the shirt that was collected near the murder scene and was properly admitted at trial. Thus, we find no plain error in the admission of the T-shirt. Shaw is due no relief on this claim.

### F.

■ Shaw next argues that the State failed to present a chain of custody for the two guns—a Charter Arms .38 caliber revolver and a Ruger .357 Magnum—that were admitted into evidence as State's exhibits 121 and 122.

Crime-scene investigator Charles Bailey testified that State's exhibit 121 was the Charter Arms revolver that he recovered approximately 1,200 feet from the Gilberts' driveway. (R. 1091.) He said that State's exhibit 122 was the Ruger .357 Magnum that he recovered the day after the murders in a tall grassy area near the Gilberts' house. Those exhibits were received into evidence without objection. (R. 1092.) Thus, we review this claim for plain error. See Rule 45(a), Ala. R.App. P. The State also introduced photographs of the guns in the locations where they had been discovered. State's exhibit 87 is a photograph of the Charter Arms revolver, and State's exhibit 88 is a photograph of the Ruger .357 Magnum. Bailey also said that he processed the guns for fingerprints and found no prints on either gun. Bailey identified the guns admitted at trial as the

guns he had collected near the scene of the murders.

"[B]ecause the condition of the [guns were] not an issue in this case, and [their] authenticity was established by other means, it was not necessary to establish a chain of custody." *Ex parte Works*, 640 So.2d 1056, 1059 (Ala.1994). Accordingly, the guns were correctly admitted into evidence. Shaw is due no relief on this claim.

### VII.

■ Shaw next argues that in closing argument in the guilt phase the prosecutor improperly commented on Shaw's right to remain silent following his arrest. Specifically, he challenges the following argument made by the prosecutor in closing:

"The defense says [Shaw] in that video was as high as a person can be. And I submit to you, ladies and gentlemen of the jury, I don't think that's at all accurate, and I think when you have an opportunity to read the transcript, you'll have it back there in the jury box with you, and listen to the DVD again, if you so choose, you won't think so either. I've gone through and counted 15 times that [Shaw] is given an opportunity to explain. He never once says I was high out of my mind. I didn't know what was going on. I just stole something. I didn't kill anybody. That's not what he says. He manipulates and he tries to control that interview.

"Detective Gomien says: It's been a long day, ain't it? He says: Every day's a long day.

"He doesn't answer any of these questions. He tries to turn around all of the questions on the officers. That's not someone who is high as a person can be, and that's certainly not the words of an innocent person.

"Detective McLean tries to talk to him about what his mom said about

knowing the Bible. [Shaw] fully in his right mind, totally aware of what he's done, says: No need to waste y'all's time.

"He knows exactly what he's doing. Detective McLean's trying to get him talking, and he didn't want to. He didn't want to tell them anything.

"Detective McLean says: Well, in order to get you to talk, you know—

"And what does the defendant say? We're talking. And you heard his voice, and you saw his demeanor, and you saw what the response to that question really meant.

"Detective Gomien: I want to talk about today. The defendant: Talk about it. Talk about it.

"He's wise enough to know he doesn't want to sign what they put in front of him, and he looks at it, and he contemplates it, and he considers it before he does it. He's not high as a person can be. He is fully aware of what he is—

"[Defense counsel]: I object that he's not wanting to sign. He has an absolute right not to sign anything, and we're getting real close to—

"The Court: All right. [Prosecutor] take care.

"[Prosecutor]: He is fully aware of what is going on, and he is fully aware of what he's done.

"How old are you? A simple question like how old are you, he responds with: What's age got to do with it anyway? He won't answer their questions. He's turning it around into another question. He is trying to manipulate the police. Instead of taking responsibility, he's turning it around on them.

"[Defense counsel]: Judge, this is improper argument, and I object.

"The Court: Let's move on to something else. Move on."

(R. 1284–86.)

On appeal, Shaw argues that the prosecutor violated *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), by commenting on Shaw's post-arrest, post-*Miranda* silence. Shaw did not make this specific argument at trial; thus, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

The United State Supreme Court in *Doyle* held that "the use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619–20. Later in *Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), the Supreme Court clarified its holding in *Doyle* and stated:

"*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all."

447 U.S. at 408.

"'What *Anderson v. Charles,* [447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222, reh. denied, 448 U.S. 912, 101 S.Ct. 27, 65 L.Ed.2d 1173 (1980),] teaches is that the *Doyle* [*v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976),] rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings.'

*United States v. Crowder*, 719 F.2d 166, 172 (6th Cir.1983), cert. denied, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984)."

*State v. Joly*, 219 Conn. 234, 256 n. 15, 593 A.2d 96, 108 n. 15 (1991).

The Louisiana Court of Appeal, in *State v. Thibodeaux*, 687 So.2d 477 (La.Ct.App. 1996), considered whether a similar argument constituted error. The court stated:

"In *State v. Wallace*, 612 So.2d 183 (La.App. 1 Cir.1992), writ denied, 614 So.2d 1253 (La.1993), as in the case at hand, police officers indicated at trial that the defendant made some inculpatory statements after being advised of his *Miranda* rights, and the defendant did not testify at trial. The defendant in *Wallace* contended that the prosecutor improperly referred to his postarrest silence during closing arguments. During the closing arguments, the prosecutor stated:

" 'Officer Nores, Officer Boehm told you that when [the defendant] came back to the jail he said, I shot that bastard and I'd shoot all of them if you gave me a chance. Your hands are tied, but mine are not. What bastards is he talking about? I asked him. Blacks. Same thing Jeff Boehm said. Now, if there were a legitimate self-defense issue, it didn't come out in what he told the police at that time.'

"*Id.* at 188.

"The appellate court found that the prosecutor's remarks referred to the inconsistency between the defense asserted at trial (justification) and the defendant's inculpatory statements and that as such, the closing arguments did not violate *Doyle [v. Ohio*, 426 U.S. 610 (1976)]."

687 So.2d at 480–81. *See also Sidney v. State*, 571 P.2d 261, 264 (Alaska 1977) ("Omissions and inconsistencies in [the de-

fendant's] exculpatory statement could properly be pointed out at trial.... We read *Doyle v. Ohio*, [426 U.S. 610 (1976),] as not changing that rule.").

Shaw's defense was that he was so intoxicated at the time of the murders that he could not form the specific intent to kill. The prosecutor in his closing argued that Shaw's actions on the videotape were inconsistent with this defense. The prosecutor's argument was not a comment on Shaw's silence and did not violate *Doyle*.

Moreover, the United States Supreme Court in *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), recognized that a *Doyle* violation may be harmless beyond a reasonable doubt. This Court has likewise found that a *Doyle* violation may be harmless. *See Kelley v. State*, [Ms. CR–10–0642, Sept. 5, 2014] —— So.3d ——, —— (Ala.Crim.App. 2014) ("Assuming without deciding that a *Doyle* violation occurred, any error was harmless and did not rise to the level of plain error. Rule 45A, Ala. R.App. P."). *See also State v. Mason*, 420 S.W.3d 632, 639–40 (Mo.Ct.App.2013) ("[O]ur review of the record convinces us that Defendant is not entitled to any relief because the [*Doyle*] error was harmless beyond a reasonable doubt."); *State v. Grant*, 105 So.3d 81, 88 (La.Ct.App.2012) ("A *Doyle* error is subject to a harmless error review."); *Beasley v. State*, 74 So.3d 357, 362 (Miss. Ct.App.2010) ("Even assuming a *Doyle* violation, the Supreme Court has held that any error in permitting a prosecutor to comment on the defendant's right to remain silent is subject to harmless error review."); *Sobolewski v. State*, 889 N.E.2d 849, 857 (Ind.Ct.App.2008) ("[T]he use of a defendant's post-arrest silence to impeach a defendant's exculpatory explanation is subject to harmless error analysis."); *State v. Bereis*, 117 Conn.App. 360, 379, 978 A.2d 1122, 1134 (2009) ("[W]e conclude

that the *Doyle* violation in this case was harmless beyond a reasonable doubt."); and *State v. Pruitt,* 42 Kan.App.2d 166, 173, 211 P.3d 166, 172 (2009) ("An error of constitutional magnitude [a *Doyle* violation] is governed by the federal constitutional error rule, which provides that an error is only harmless if it can be declared beyond a reasonable doubt to have had little, if any, likelihood of changing the trial's outcome."). Even if we were to find that there was a *Doyle* violation, which we do not, any conceivable error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Shaw is due no relief on this claim.

## VIII.

Shaw next argues that his two convictions for the capital offense of murder during the course of burglary were improper because, he says, the State improperly relied on the murder of each victim as the underlying offense to establish the burglary. Specifically, Shaw argues that use of the murder itself to elevate the crime to capital murder "violates the requirement that capital murder statutes 'genuinely narrow' the class of persons eligible for the death penalty." (Shaw's brief, p. 91.)

Shaw did not raise this issue at trial; therefore, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

This Court has previously considered and rejected this argument. In *Hyde v. State,* 778 So.2d 199 (Ala.Crim.App.1998), we stated:

"[Hyde] erroneously argues that the trial court erred in allowing the murder to be elevated to capital murder based on the same facts that constituted the murder itself. Because the State showed that the appellant committed the murder during a burglary of Whitten's house,

the murder was properly elevated to, and the appellant was properly convicted of, the capital offense of burglary/murder. See § 13A–5–40(a)(4), Ala. Code 1975."

778 So.2d at 213. In *Whitehead v. State,* 777 So.2d 781 (Ala.Crim.App.1999), this Court held:

"Whitehead contends that 'the use of the murder itself to elevate the murder to capital murder violates the requirement that capital murder statutes "genuinely narrow" the class of persons eligible for the death penalty.' (Whitehead's brief to this court, p. 20.) This same argument was raised on appeal by Whitehead's codefendant Hyde and was rejected by this court. See *Hyde [v. State],* [778 So.2d 199 (Ala.Crim.App. 1998) ]. Likewise, we reject Whitehead's argument. Whitten's murder was elevated to capital murder because it was committed during the course of a burglary and because the victim was a witness, not because of the murder itself. See § 13A–5–40(a)(4), Ala.Code 1975. Because the State sufficiently proved the elements of burglary, Whitehead was properly convicted of the capital offense of murder during a burglary."

777 So.2d at 839. Here, the murders were elevated to capital murders because they were committed during the course of a burglary and not because of the murders themselves. *See Whitehead, supra.* Shaw was properly charged and convicted of murdering Doris Gilbert and Robert Gilbert during the course of a burglary.

In the same section of his brief, Shaw also argues that his convictions for burglary/murder were invalid because, he says, the circuit court failed to define the underlying crime of "theft" to satisfy the burglary element of the capital-murder offense. There was no objection made at the con-

clusion of the court's instructions; therefore, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

This Court has specifically addressed this issue and stated:

"The appellant also contends that the court's instructions on burglary were erroneous in that the court failed to define theft. However, we do not believe that this failure amounted to plain error.

"We are persuaded by the state's argument, which concerns the components of the offense of burglary. Section 13A–7–5[, Ala.Code 1975,] defines burglary in the first degree as follows:

" 'A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in dwelling or in immediate flight therefrom, he or another participant in the crime:

" '(1) Is armed with explosives or a deadly weapon. . . .'

"As this court stated in *Richardson v. State*, 456 So.2d 1152 (Ala.Cr.App.1984):

" 'Under Alabama Code 1975, § 13–2–40, defining first degree burglary (not to be confused with burglary as defined in Alabama's new Criminal Code, Alabama Code (1975), § 13A–7–5 et seq.), and at common law, "a defendant who breaks and enters into a dwelling house must, at the time he does so, intend to commit a felony therein. *It is not necessary that the felony intended be committed.* Nor does it matter why the intended felony was not committed." C. Torcia, 3 *Wharton's Criminal Law* § 338 (1980).'

"456 So.2d at 1155. (Emphasis added.)

"Because it is not necessary for a conviction of first degree burglary that

the intended felony be committed, we find no plain error in the court's failure to define the elements of the underlying felony, i.e., theft."

*Hutcherson v. State*, 677 So.2d 1174, 1199–1200 (Ala.Crim.App.1994), *rev'd on other grounds*, 677 So.2d 1205 (Ala.1996).

Later, the Alabama Supreme Court in *Ex parte Hagood*, 777 So.2d 214 (Ala.1999), stated the following concerning a circuit court's failure to define the term "theft" in the court's penalty-phase jury instructions in a capital case concerning the application of the aggravating circumstance that the murder was committed in the course of robbery:

"The Court of Criminal Appeals, in its well-reasoned opinion, recognized that there are instances where, even though a term has been defined by statute, the failure to define that term for the jury does not constitute reversible error. It went on to explain that in those instances, the 'term' is not susceptible to different interpretations. Consequently, it stated that it could not say that the term 'theft' is subject to only one interpretation and thus could not say that the term 'theft' could be understood by average jurors in its common usage. [*Hagood v. State*,] 777 So.2d [162] at 197 [ (Ala.Crim.App.1998) ]. We disagree.

"The Court of Criminal Appeals recognized in its opinion that in some cases, even though a relevant term is statutorily defined, the trial court's failure to give the statutory definition does not constitute reversible error. This is one of those cases. The term 'theft' is a term of sufficient common understanding and did not need to be specifically defined in order for the jury to adequately consider the crime of robbery as an aggravating circumstance in this case. Other courts that have addressed this issue have reached the same result. See *State v. Ng*, 110 Wash.2d 32, 44, 750

P.2d 632, 639 (1988) ('theft,' like 'assault,' is a term of such common understanding as to allow the jury to convict of robbery); see also *Commonwealth v. Yarris*, 519 Pa. 571, 598, 549 A.2d 513, 527 (1988) ('theft' is commonly understood as stealing, and the trial court's recitation of theft as an element of the crime of robbery is adequate); *Gauldin v. State*, 632 S.W.2d 652, 656 (Tex.App. 1982) (the charge to the jury, which included as an element of the robbery offense, that it occurred 'in the course of committing theft,' is sufficient); *State v. Hudson*, 157 W.Va. 939, 944–45, 206 S.E.2d 415, 419 (1974) (instruction that the crime of robbery consists of a felonious taking of property from a person by violence and that it also consists of theft of property from the victim by the use of force and arms was held sufficient); compare *Grant v. State*, 420 So.2d 903 (Fla.Dist.Ct.App.1982) (the elements of the underlying felony need not be explained with the same particularity that would be required if that offense were the primary crime charged); and *Hensley v. State*, 228 Ga. 501, 503–04, 186 S.E.2d 729, 731 (1972) (the trial court's instructions to the jury, defining 'armed robbery' in the language of a Georgia statute, which uses the term 'with intent to commit theft,' were sufficient).

"In a capital case, when the judge is charging the jury on the underlying felony stated in the aggravating circumstance found in § 13A–5–49(4), Ala.Code 1975, the preferred practice is to charge the jury on each element of the applicable underlying felony. However, in this case, we conclude that the trial court's failure to give the jury the statutory definition of 'theft' was not error, because the instruction sufficiently apprised the jury of the crime of robbery."

777 So.2d at 219–20.

For these reasons we likewise find no plain error in the circuit court's failure to instruct the jury on the definition of "theft"—the underlying offense for burglary. *See Hagood, supra.* Shaw is due no relief on this claim.

## IX.

▆ Shaw next argues that his convictions for four counts of capital murder for murdering two people violate the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. Specifically, he argues that Count II of each of the two indictments was the same offense; thus, he argues, he was convicted twice of violating § 13A–5–40(a)(10), Ala.Code 1975, for killing two people pursuant to one scheme or course of conduct.

The two indictments returned against Shaw charged, in pertinent part:

*Indictment I*

"Count I

"Aubrey Lynn Shaw whose name is to the Grand Jury otherwise unknown than as stated, did intentionally cause the death of another person, to-wit: Doris Gilbert, by stabbing her with a knife, and the said Aubrey Shaw caused said death during the time that he knowingly and unlawfully entered or remained, or attempted to enter or remain, unlawfully in a dwelling of another, to-wit: Robert and Doris Gilbert, with intent to commit a crime therein, to-wit: murder and/or theft, and while effecting entry or while in said dwelling or in immediate flight therefrom, the said Aubrey Shaw did cause physical injury to the said Doris Gilbert who was not a participant in the said crime, by, to-wit: stabbing her with a knife, in violation of § 13A–5–40(a)(4) of the Code of Alabama.

"Count II

"Aubrey Shaw, whose name is to the Grand Jury otherwise unknown than as

stated did intentionally cause the death of another person, to-wit: Doris Gilbert, by stabbing her with a knife, and did intentionally cause the death of another person, to-wit: Robert Gilbert, by stabbing him with a knife, pursuant to one scheme or course of conduct, in violation of § 13A–5–40(a)(10), of the Code of Alabama."

*Indictment II*

"Count I

"Aubrey Lynn Shaw whose name is to the Grand Jury otherwise unknown than as stated, did intentionally cause the death of another person, to-wit: Robert Gilbert, by stabbing him with a knife, and the said Aubrey Shaw caused said death during the time that he knowingly and unlawfully entered or remained, or attempted to enter or remain, unlawfully in a dwelling of another, to-wit: Robert and Doris Gilbert, with intent to commit a crime therein, to-wit: murder and/or theft, and while effecting entry or while in said dwelling or in immediate flight therefrom, the said Aubrey Shaw did cause physical injury to the said Robert Gilbert who was not a participant in the said crime, by, to-wit: stabbing him with a knife, in violation of § 13A–5–40(a)(4) of the Code of Alabama.

"Count II

"Aubrey Shaw, whose name is to the Grand Jury otherwise unknown than as stated did intentionally cause the death of another person, to-wit: Robert Gilbert, by stabbing him with a knife, and did intentionally cause the death of another person, to-wit: Doris Gilbert, by stabbing her with a knife, pursuant to one scheme or course of conduct, in violation of § 13A–5–40(a)(10), of the Code of Alabama."

"A defendant can be convicted of two or more capital murders for the death of one victim, so long as those convictions are in accordance with *Blockburger [v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ], i.e., so long as each conviction required an element not required in the other convictions." *Heard v. State*, 999 So.2d 992, 1009 (Ala.2007).

In this case, the only distinction in Count II of both indictments is the order of the names of the two victims. Both counts required proof of the exact same elements—the intentional murders of both Doris Gilbert and Robert Gilbert.

This Court in *Yeomans v. State*, 898 So.2d 878 (Ala.Crim.App.2004), held that the multiple convictions in that case for the capital offense of killing two or more people during one course of conduct violated the Double Jeopardy Clause. We stated:

"The Double Jeopardy Clause provides that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb.' U.S. Const., Amend. V. The United States Supreme Court has discussed the constitutional principles regarding the prohibition against double jeopardy quite simply:

" 'In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the "same-elements" test, the double jeopardy bar applies. See, e.g., *Brown v. Ohio*, 432 U.S. 161, 168–169 [97 S.Ct. 2221, 53 L.Ed.2d 187] (1977); *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (multiple punishment); *Gavieres v. United States*, 220 U.S. 338, 342 [31 S.Ct. 421, 55 L.Ed. 489] (1911) (successive prosecutions). The same-elements test, sometimes referred to as the *"Blockburger"* test, inquires whether each offense contains an element not contained in the

other; if not, they are the "same offense" and double jeopardy bars additional punishment and successive prosecution.'

"*United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).

"The three indictments charging Yeomans with the murder of two or more persons pursuant to one scheme or course of conduct were alternative methods of charging the same offense. The only variation in the three indictments was the order in which the victims' names were listed. The same elements established each of the three charges; none of the three offenses contained an element not also required for the other two offenses. Therefore, convictions on these counts violated double-jeopardy principles, and the convictions on the three separate counts of capital murder pursuant to § 13A–5–40(a)(10), Ala.Code 1975, cannot stand. See *Wynn v. State,* 804 So.2d 1122, 1150 (Ala.Crim.App. 2000); *Stewart v. State,* 601 So.2d 491, 494–95 (Ala.Crim.App.1992), aff'd in part, rev'd in part on other grounds, 659 So.2d 122 (Ala.1993), aff'd, 730 So.2d 1246 (Ala.1999)."

898 So.2d at 890. *See Parks v. State,* 989 So.2d 626, 634 (Ala.Crim.App.2007) ("[The defendant] alleges that his constitutional protection against double jeopardy was violated when he was tried and convicted of counts one and two of his indictment for murder wherein two or more persons are murdered by one act or pursuant to one course or scheme of conduct when both counts reflect the murder of the same two people. We agree with his argument that counts one and two of his indictment represented the death of two persons committed by one act or course of conduct and merely reversed the order of the victim's names in each count.").

A Texas Court of Appeals has reached this same conclusion:

"Here, according to the State, Saenz committed capital murder by violating section 19.03(a)(7)(A) of the Texas Penal Code. Section 19.03(a)(7)(A) provides that a person commits capital murder if he murders more than one person during the same criminal transaction. Tex. Pen.Code Ann. § 19.03(a)(7)(A) (Vernon 2003). Looking at statutory construction, section 19.03(a)(7)(A) defines capital murder as the murder of more than one person. Unlike other assault-type offenses that require only one victim, section 19.03(a)(7)(A) states that in committing capital murder, a person must murder more than one victim. As such, section 19.03(a)(7)(A) necessarily requires the murder of more than one victim. Therefore, we hold that the allowable unit of prosecution for section 19.03(a)(7)(A) is more than one victim.

"Here, Saenz was accused in three separate counts of the capital murder of three victims. If the allowable unit of prosecution is more than one victim, Saenz necessarily committed only one capital murder. All three counts contain the same victims, the same allowable unit of prosecution. All three counts, therefore, constitute only one offense of capital murder. Because the indictment states only one allowable unit of prosecution, Saenz can be convicted of only one offense. As such, Saenz's double jeopardy rights were violated."

*Saenz v. State,* 131 S.W.3d 43, 52 (Tex. App.2003) (footnotes omitted).

For the reasons stated by this Court in *Yeomans,* Shaw could not be convicted of two counts of murdering the same two individuals during one scheme or course of conduct. Thus, one of Shaw's convictions

for violating § 13A–5–40(a)(10), Ala.Code 1975, is due to be set aside.[8]

*Penalty–Phase Issues*

**X.**

Shaw next asserts that the circuit court undermined the presentation of mitigation evidence and his right to counsel by allowing Shaw to waive—against his attorney's advice—the presentation of additional mitigating evidence.

The following exchange occurred after witnesses had testified on Shaw's behalf during the penalty phase:

"The Court: [Defense counsel,] I understand an issue has come up regarding proceeding forward with the mitigation stage, and if you'll put something on the record, I'll take it from there.

"[Defense counsel]: Yes, your Honor. At this point in time, once we broke for lunch, we spoke with Mr. Shaw, and we've had some ongoing discussions since a little before noon today, and at this point in time he has told us he does not wish to go forward with the rest of his mitigation phase with witnesses which would, the bulk of them, be family witnesses that would testify to social history, family history, incidents of abuse, various forms of abuse, the physical, sexual, emotional, in addition to some of the extended drug use and abuse. He has told us, and it's still his opinion, that I can call Dr. [Thomas S.] Bennett, which I would still like to do and go forward with.

"At this point in time, Judge, everyone's aware that we qualified quite a number of mitigation witnesses when we started this process about a week ago or close to a week ago, and when we broke

yesterday, your Honor was aware that it would be a full day, if not longer, of mitigation evidence and that this phase was extremely important to this trial, and it's something that we've, it's been no secret to anybody, we've diligently been working on and putting hours and hours into for an extended period of time that he has unequivocally told us at this point we cannot call anymore family members who would testify to all the social history.

"The Court: Okay. All right. All right. Mr. Shaw, way back whenever this case was arraigned, you know, I appointed you two very skilled and qualified defense counsel. You understand that?

"[Shaw]: (Nods head up and down.)

"The Court: And if you'll answer out loud so my court reporter can—

"[Shaw]: Yes.

"The Court: And your counsels clearly tried this case with an eye towards what they were going to do at this stage of the proceedings, if necessary, and now you're wanting to hamstring them a little bit. And I understand you don't want your family to have to go through painful stuff from the past. I understand that. I do. They understand that, I'm sure, but it's my understanding if you have these folks—they're willing to do this; is that right? Is that my understanding?

"[Defense counsel]: Absolutely, Judge.

"The Court: The family is willing to do it?

"[Defense counsel]: Yes.

---

**8.** Shaw was properly convicted of two counts of burglary/murder and one count of murdering two people during one scheme or course of conduct. Each of those convictions required elements that the other convictions did

not. We have upheld similar convictions against double-jeopardy attacks. *See Lewis v. State,* 57 So.3d 807 (Ala.Crim.App.2009); and *Williams v. State,* 710 So.2d 1276, 1321 (Ala. Crim.App.1996).

"The Court: So, Mr. Shaw, they've bitten the bullet, so to speak. They're willing to do it. I know you didn't want to put them through it, but they want to do it for you is what it looks like to me. As hard as it is for them, and it's going to be hard, it's going to be hard for you and hard for everybody. It's going to hard for everybody to listen to bad stuff that happens, but your lawyers feel this is necessary for you to do for the benefit of this jury because this jury doesn't know you. They don't know your background. They don't know all your history, and they're not going to know it all unless your lawyers put these witnesses on. Look, I'm not going to make you do anything, but I will say your lawyers— I've authorized, I know, thousands and thousands of dollars of expenses to get this testimony lined up, and you have an expert. It's a lot of money, and it's well spent money in my opinion, because I think every defendant is entitled to his day in court and due process. That's a very important clause in the Alabama Constitution and the United State Constitution. I want you to have your full due process, I do, and your lawyers believe this testimony is absolutely necessary for you to get full—your full day in court, and I do, too. And I really encourage you to think about allowing them to put on this testimony. Again, I know it's emotional. It's a hard day, but this is—it's been several years now, and it's about to end. It's coming to a close, and your lawyers want to do everything they can to help you in this proceeding. Okay? And I would implore you—again, these aren't rookie lawyers. These are folks that have had a lot of experience in this area. They know what they're doing. They know what they're doing. So when they're telling you this is something you ought to do, this is something you probably ought to do, all right,

again, as hard as it is. So if you would, I mean, will you consider talking with them a little bit more about this and reconsidering the instruction you've given them at this point?

"[Shaw]: (No audible response.)

"The Court: I mean, they've put a lot of time into this case.

"[Shaw]: Your Honor, you know, from the get-go, I never wanted my family members on that stand. I know people's been hurt. I know, and I just feel like, you know, enough's been said. God is the final judge of all mankind, you know."

(R. 1431–35.) After this exchange, Shaw's defense counsel called three additional witnesses to testify on Shaw's behalf: Dr. Thomas S. Bennett, a clinical psychologist; Shaw's wife, Heather Michelle Shaw; and Shaw's cousin, Christy Lane Wynn. Shaw did not object to the court's method of handling this issue; thus, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

### A.

First, Shaw argues that the circuit court interfered with his right to counsel by permitting him to waive the presentation of mitigation evidence.

This Court has recognized that a competent defendant may waive the presentation of mitigation evidence at the penalty phase of a capital-murder trial.

"We hold that a competent defendant can waive the presentation of mitigating evidence at a capital sentencing proceeding, provided the trial court carefully weighs possible statutory and nonstatutory mitigating circumstances against the aggravating circumstances to assure that death is the appropriate sentence."

*Nelson v. State,* 681 So.2d 252, 255 (Ala. Crim.App.1995). The majority of other

states that have considered this issue have reached this same conclusion. *See State v. Robert*, 820 N.W.2d 136 (S.D.2012); *State v. Hausner*, 230 Ariz. 60, 280 P.3d 604 (2012); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239 (2010); *State v. Bordelon*, 33 So.3d 842 (La.2009); *Grim v. State*, 971 So.2d 85 (Fla.2007); *Byrom v. State*, 927 So.2d 709 (Miss.2006); *State v. Passaro*, 350 S.C. 499, 567 S.E.2d 862 (2002); *People v. Lavalle*, 181 Misc.2d 916, 697 N.Y.S.2d 241 (1999); *Zagorski v. State*, 983 S.W.2d 654 (Tenn.1998); *State v. Coleman*, 168 Ill.2d 509, 660 N.E.2d 919, 214 Ill.Dec. 212 (1995); and *People v. Bloom*, 48 Cal.3d 1194, 774 P.2d 698, 259 Cal.Rptr. 669 (1989).

Our neighboring State of Florida has recognized:

"Competent defendants who are represented by counsel maintain the right to make choices in respect to their attorneys' handling of their cases. This includes the right to either waive presentation of mitigation evidence or to choose what mitigation evidence is introduced by counsel. See, e.g., *Boyd v. State*, 910 So.2d 167, 189–90 (Fla.2005) ('Whether a defendant is represented by counsel or is proceeding pro se, the defendant has the right to choose what evidence, if any, the defense will present during the penalty phase.')."

*Hojan v. State*, 3 So.3d 1204, 1211 (Fla. 2009).

The circuit court correctly allowed Shaw to limit his attorneys' presentation of mitigating evidence at the penalty phase of his capital-murder trial.

## B.

Shaw further argues that even if he could legally waive the presentation of mitigation evidence the circuit court's inquiry into that waiver was not adequate.

This Court in *Adkins v. State*, 930 So.2d 524 (Ala.Crim.App.2001), cited with approval the Tennessee Supreme Court's decision in *Zagorski v. State*, 983 S.W.2d 654 (Tenn.1998), in which that court noted the requirements for waiving the presentation of mitigation evidence:

"[W]hen a defendant, against his counsel's advi[c]e, refuses to permit the investigation and presentation of mitigating evidence, counsel must inform the trial court of these circumstances on the record, outside the presence of the jury. The trial court must then take the following steps to protect the defendant's interests and to preserve a complete record:

"1. Inform the defendant of his right to present mitigating evidence and make a determination on the record whether the defendant understands this right and the importance of presenting mitigating evidence in both the guilt phase and sentencing phase of trial;

"2. Inquire of both the defendant and counsel whether they have discussed the importance of mitigating evidence, the risks of foregoing the use of such evidence, and the possibility that such evidence could be used to offset aggravating circumstances; and

"3. After being assured the defendant understands the importance of mitigation, inquire of the defendant whether he or she desires to forego the presentation of mitigating evidence."

983 S.W.2d at 660.

Shaw did not waive the presentation of all mitigation evidence, however; Shaw merely waived the presentation of some of his family members' testimony. The following individuals testified on Shaw's behalf during the penalty phase: Dr. Thomas S. Bennett, a clinical psychologist; Carol Sue Morgan, Shaw's aunt; Christy Lane Wynn, Shaw's cousin; and Heather Mi-

chelle Shaw, Shaw's wife. Each of those witnesses gave very detailed testimony.

Other states have recognized the distinction between waiving the presentation of *all* mitigating evidence and *limiting* the presentation of mitigation evidence. Courts in Florida and Ohio have held that a detailed colloquy is not required when a defendant merely limits his attorney's presentation of mitigating evidence but does not waive the presentation of all mitigation evidence. *See Boyd v. State,* 910 So.2d 167, 188 (Fla.2005) ("[W]hen a defendant waives presentation of mitigation against his attorney's wishes, the trial court must be informed of this decision, the attorney must indicate on the record whether there is mitigating evidence that could be presented and what that evidence would be, and the defendant must confirm that he has discussed these matters with his attorney and that despite his attorney's recommendation, he still wishes to waive mitigation.... [These requirements] are not applicable in this case because [the defendant] presented mitigating evidence."); *State v. Monroe,* 105 Ohio St.3d 384, 396, 827 N.E.2d 285, 300 (2005) ("Given our emphasis in [*State v.*] *Ashworth* [, 85 Ohio St.3d 56, 706 N.E.2d 1231 (1999),] on the word, 'all,' it is clear that we intended to require an inquiry of a defendant only in those situations where the defendant chooses to present no mitigating evidence whatsoever.").

We agree with the reasoning of the above decisions from Florida and Ohio; because Shaw did not waive the presentation of all mitigation evidence at the penalty phase of the trial, the circuit court was not required to conduct a full *Faretta*-type inquiry.[9]

Moreover, even if the circuit court was required to conduct an in-depth colloquy before recognizing Shaw's waiver, the court's colloquy with Shaw was more than sufficient to satisfy this standard. *See Zagorski, supra.* For these reasons, we find no error in regard to this claim. Shaw is due no relief.

## XI.

■ Shaw next argues that the State elicited improper aggravating evidence in the penalty phase during the cross-examination of Shaw's mitigation witnesses. Specifically, he argues that it was error for the State to elicit testimony that Shaw had been accused of sexual abuse and that he stole from his step-grandfather.

Shaw made no objections when that testimony was elicited at the penalty phase; therefore, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

Initially, we note that § 13A–5–45(d), Ala.Code 1975, addresses the evidence that is admissible at the penalty phase of a capital-murder trial. That section states:

"*Any* evidence which has probative value and is relevant to sentence shall be received at the sentencing hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is afforded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama."

(Emphasis added.) Moreover, "[u]nder the provisions of §§ 13A–5–45(c) and (d), the strict rules of evidence are not applicable to sentencing hearings." *Billups v.*

9. In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court held that before a defendant could validly waive his or her right to counsel the waiver must be knowingly and intelligently made.

*State,* 72 So.3d 122, 132 (Ala.Crim.App. 2010). *See also* Rule 1101(b), Ala. R. Evid.

Shaw's maternal aunt, Carol Sue Morgan, testified that Shaw was her sister's third child and that her mother, the woman who had raised Shaw, had been abusive. The following occurred during her direct examination:

"[Defense counsel]: And you talked about the things that he went through, and you've told us a little about some of the things that you went through?

"[Morgan]: Yes, ma'am.

"[Defense counsel]: Is that—that kind of behavior, did it continue through the next generation as far as you know, your conversations with [Shaw] and others, the beatings?

"[Morgan]: I do know that he used to get beatings, and he got—it was terrible. I mean, the boy never had a chance. I mean, his mama didn't want him. Then he comes and lives with mama who does some things to him that is gonna come out later.

"[Defense counsel]: And when you say did some things to him, what are you talking about, Carol? I know it's hard for you.

"[Morgan]: There's gonna be a lot of people that don't believe me, but I'm—things. Everybody knew that my mother—and at the time I didn't have any idea. I just thought he was her favorite. I mean, she was like obsessed with that child.

"[Defense counsel]: And when you say 'things,' are you talking about inappropriate things?

"[Morgan]: Very much.

"[Defense counsel]: Is [Shaw] the only grandchild that inappropriate things were done to?

"[Morgan]: No, ma'am.

"[Defense counsel]: How many others that you're aware of?

"[Morgan]: My two girls. DHR [the Department of Human Resources] got called, and I'm sure it's documented, 'cause they—they got called when something come out.' "

(R. 1411–12.) On cross-examination, the State elicited testimony from Morgan that the Department of Human Resources ("DHR") had been called after Morgan's second-grade granddaughter told her mother that Shaw had molested her.

■■■■■ "The scope of cross-examination in Alabama is quite broad." *Ex parte Deardorff,* 6 So.3d 1235, 1241 (Ala.2008).

"Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit the witness."

*Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

"[E]vidence which is otherwise inadmissible is admissible to explain or rebut evidence introduced by defendant. This is true even if a defendant admits evidence during cross-examination of a State's witness, prompting the State to introduce otherwise inadmissible evidence in rebuttal. Therefore, where a defendant examines a witness so as to raise an inference favorable to defendant, which is contrary to the facts, defendant opens the door to the introduction of the State's rebuttal or explanatory evidence about the matter."

*State v. O'Hanlan,* 153 N.C.App. 546, 561, 570 S.E.2d 751, 761 (2002). "Where one

party has opened the door on an issue, the opposing party may introduce evidence to negate any false impressions created." *United States v. Goodman,* 243 Fed.Appx. 137, 140 (6th Cir.2007) (not selected for publication in the *Federal Reporter*). "It is fundamental that where the defendant 'opened the door' and 'invited error' there can be no reversible error." *United States v. Beason,* 220 F.3d 964, 968 (8th Cir.2000).

Certainly, Shaw opened the door to the above testimony when he asked Morgan about the allegations of sexual abuse in the household where Shaw was raised. The prosecutor's questions concerning the DHR report were within the scope of a proper cross-examination and did not constitute error, much less plain error.

Shaw also argues that it was error to cross-examine Christy Lane Wynn, Shaw's cousin, about allegations of sexual abuse that had been made against Shaw and allegations that Shaw assaulted and stole from his step-grandfather. The following occurred during Wynn's direct examination:

"[Defense counsel]: Christy, in addition to your grandmother, were there other sexual abuse perpetrators that you're aware of in the house?

"[Wynn]: Yes, ma'am. I know of an instance, and it's hard to talk about because I know it's hard for him, too, but there was this guy, he was a Navy guy, my grandmother let come from time to time to stay there when he was in, would allow him to sleep with my cousin, Aubrey [Shaw]. I heard things that I didn't want to hear.

"....

"[Defense counsel]: And I expect the Assistant District Attorney or the District Attorney will ask you some questions. Was there ever an incident where there was a report made regarding your daughter—

"[Wynn]: Yes.

"[Defense counsel]: —being potential victims?

"[Wynn]: Yes, it was.

"[Defense counsel]: Now, you've told us there's been a cycle of sexual abuse—

"[Wynn]: Yes.

"[Defense counsel]: —running rampant throughout Gilbert Stables? And was that report made accusing [Shaw] as doing something inappropriate?

"[Wynn]: Yes."

(R. 1498–1505.) On cross-examination, the State questioned Wynn about various reports that had been made to DHR regarding allegations of sexual abuse made against Shaw. The State also questioned Wynn about whether she had ever seen Shaw beat up Tommy Gilbert, Shaw's step-grandfather, and take his money and truck. Wynn denied ever having seen this but said that she had heard about such instances.

In rebuttal, the State presented the testimony of Carol Ann Clark. She testified:

"[Prosecutor]: Did you ever see Tom [Shaw's step-grandfather] have any problems with Aubrey Shaw?

"[Clark]: I saw him—I saw Aubrey Shaw run him over one night and steal his money and his keys and his truck and knock the poor old man on the ground.

"....

"[Clark]: Aubrey Shaw used to steal his truck often, like at least three times a week....

"[Clark]: Aubrey Shaw had attacked him at times for money for his drug habit. And he, also Mister Tom, had told me that he had lost hundreds of thousands of dollars in tools every year because Aubrey Shaw kept stealing them to support his drug habit."

(R. 1522–24.) Again, the questions asked of Wynn concerning the DHR report were questions within the scope of cross-examination and were proper. Accordingly, we find no error, much less plain error, in regard to this claim. *See Ex parte Deardorff, supra.*

██ Moreover, Clark's testimony concerning Shaw's conduct toward his step-grandfather was properly admitted during the penalty phase because it was relevant to the issue of sentencing. Section 13A–5–45(d), Ala.Code 1975. Shaw is due no relief on this claim.

## XII.

██ Shaw next argues that the State failed to present sufficient evidence to establish the aggravating circumstance that he had previously been convicted of a crime of violence.

Section 13A–5–49(2), Ala.Code 1975, provides, in part: "Aggravating circumstances shall be the following: ... (2) The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person." "This aggravating circumstance was intended to single out those individuals who pose a present danger to the public because they have threatened felonious violence in the past." *Hadley v. State,* 575 So.2d 145, 156 (Ala.Crim.App.1990).

In its sentencing order, the circuit court stated the following concerning this aggravating circumstance:

"The State presented evidence and again relies upon the convictions in the robbery third cases for this aggravator. The indictments to which [Shaw] pled guilty allege that Shaw did in the course of committing theft of property (purses/wallet) use force against the victims with the intent to overcome his/her physical resistance or physical power of resistance. The defense does not chal-

lenge the existence of this aggravator. The Court finds this aggravating circumstance does exist, and it is considered by the Court."

(C. 99–100.)

The State presented evidence indicating that Shaw had two prior felony convictions for robbery in the third degree, a violation of § 13A–5–43, Ala.Code 1975. The case-action summaries for the two prior convictions and the indictments relative to each conviction were admitted into evidence in the penalty phase. In May 2003, Shaw was indicted for robbery in the third degree. That indictment read as follows:

"Aubrey Lynn Shaw whose name is to the Grand Jury otherwise unknown than as stated, did in the course of committing a theft of property to-wit: a purse and contents, the property of Donna Hartman, use force against the person of Donna Hartman and/or Lisa McGhee, with intent to overcome her physical resistance or physical power of resistance, in violation of § 13A–8–43(a)(1), Ala.Code 1975."

The case-action summary reflects that Shaw pleaded guilty to that offense in December 2003.

In February 2004, Shaw was indicted for robbery in the third degree. That indictment read:

"Aubrey Lynn Shaw whose name is to the Grand Jury otherwise unknown than as stated, did in the course of committing a theft of property, to-wit: a wallet and it's contents, the property of Norman Cox, use force against the person of Norman Cox, with intent to overcome his physical resistance or physical power of resistance, in violation of § 13A–8–43(a)(1), Ala.Code 1975."

The case-action summary shows that in March 2004 Shaw pleaded guilty to the charged offense.

Section 13A–8–43, Ala.Code 1975, provides:

"(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:

"(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or

"(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."

This Court in *Hadley v. State*, 575 So.2d 145 (Ala.Crim.App.1990), stated the following concerning the application of this aggravating circumstance:

"Historically, offenses which have been found to uphold this aggravating circumstance include: armed robbery, *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981); kidnapping and attempted first degree murder, *Fitzpatrick v. State*, 437 So.2d 1072 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984); discharging a firearm into occupied property, *State v. Brown*, 320 N.C. 179, 358 S.E.2d 1 (N.C.1987), cert. denied, 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 406 (1987); and robbery and aggravated robbery, *Gardner v. State*, 297 Ark. 541, 764 S.W.2d 416 (1989). In Alabama, offenses which have been held to uphold this aggravating circumstance include: robbery, *Brownlee v. State*, 545 So.2d 151 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.1989), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); capital murder, *Jones v. State*, 450 So.2d 165 (Ala.Cr.App.1983), affirmed, 450 So.2d 171 (Ala.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 232, 83 L.Ed.2d 160 (1984); manslaughter, *Siebert v. State*, 562 So.2d 586 (Ala.Cr.App. 1989), affirmed, 562 So.2d 600 (Ala. 1990); murder, *Jackson v. State*, 459 So.2d 963 (Ala.Cr.App.), affirmed, 459 So.2d 969 (Ala.1984), cert. denied, 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); murder and criminal assault, *Coulter v. State*, 438 So.2d 336 (Ala.Cr. App.1982), affirmed, 438 So.2d 352 (Ala. 1983); and robbery, *Ex parte Thomas*, 460 So.2d 216 (Ala.1984)."

575 So.2d at 156–57. *See* Thomas M. Fleming, Annotation, *Sufficiency of Evidence, for Purposes of Death Penalty, to Establish Statutory Aggravating Circumstance that Defendant was Previously Convicted of or Committed Other Violent Offense, had History of Violent Conduct, Posed Continuing Threat to Society, and the like—Post-Gregg Cases*, 65 A.L.R.4th 838 (1988).

Robbery in the third degree, by its statutory definition in § 13A–8–43, Ala.Code 1975, involves the use or threat of force. Thus, proof of these convictions, by itself, was sufficient to prove the aggravating circumstance set out in § § 13A–5–49(2), Ala.Code 1975. *See State v. Holden*, 338 N.C. 394, 405, 450 S.E.2d 878, 884 (1994) ("[T]he judgment showing that the defendant had previously been convicted of attempted second-degree rape was sufficient, standing alone, to require that the trial court submit the aggravating circumstance that the defendant had committed a prior felony involving the use or threat of violence to the person."); *State v. Hamlette*, 302 N.C. 490, 504, 276 S.E.2d 338, 347 (1981) ("On its face, armed robbery involves the threat or use of violence to the person. Defendant may, of course, present evidence, if he has any, in mitigation of his involvement in the previous felony which triggers this aggravating circumstance.").

The State proved beyond a reasonable doubt the aggravating circumstance that Shaw had previously been convicted of a crime of violence. *See* § 13A–5–49(2), Ala. Code 1975. This aggravating circumstances was correctly applied in this case. For these reasons, Shaw is due no relief on this claim.

### XIII.

■ Shaw next argues that the circuit court erred in finding that the murders were especially heinous, atrocious, or cruel as compared to other capital murders.

Section 13A–5–49(8), Ala.Code 1975, provides, in part: "Aggravating circumstances shall be the following: ... (8) The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses."

In its sentencing order, the circuit court stated the following concerning this aggravating circumstance:

"Although there was no testimony elicited at trial about exactly what went on in the Gilberts' residence at the time of the murders, the forensic evidence tells a gruesome story. Two very elderly and infirm persons were brutally stabbed and slashed to death. It is clear from the numerous defensive wounds on the victims that their deaths were not instantaneous, but likely were drawn out and painful. Additionally, each suffered the mental terror and agony of having to watch a spouse being brutally assaulted with a knife, while being physically powerless to stop it. Accordingly, this aggravating circumstance does exist and is considered by the Court."

(C. 102.)

The Alabama Supreme Court has held that this aggravating circumstance is prop-erly applied when the victim or victims experience psychological torture.

"One factor this Court has considered particularly indicative that a murder is 'especially heinous, atrocious or cruel' is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture 'must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering.' *Norris v. State*, 793 So.2d 847, 861 (Ala.Crim. App.1999)."

*Ex parte Key*, 891 So.2d 384, 390 (Ala. 2004). This Court has upheld the application of this aggravating circumstance in a multiple homicide where one spouse witnessed his or her spouse's death before ultimately being stabbed to death. *See Waldrop v. State*, 859 So.2d 1138 (Ala. Crim.App.2000); *Price v. State*, 725 So.2d 1003 (Ala.Crim.App.1997). Additionally, "[a] victim's age and physical condition are relevant when assessing this aggravating circumstance." *Gobble v. State*, 104 So.3d 920, 986 (Ala.Crim.App.2010).

As the Tennessee Supreme Court has aptly stated:

"The anticipation of physical harm to oneself is torturous. [*State v.*] *Nesbit*, 978 S.W.2d [872] at 886–87 [ (Tenn. 1998) ]; *State v. Hodges*, 944 S.W.2d 346, 358 (Tenn.1997), *cert. denied*, 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997). This mental torment is intensified when a victim either watches or hears a spouse, parent, or child being harmed or killed, or anticipates the harm or killing of that close relative and is helpless to assist. *See State v. Soto–Fong*, 187 Ariz. 186, 928 P.2d 610 (Ariz. 1996), *cert. denied*, 520 U.S. 1231, 117 S.Ct. 1826, 137 L.Ed.2d 1033 (1997) (killing is especially cruel when a victim

suffers mental anguish by watching or hearing the defendant kill another or while waiting his own fate while parent or spouse is killed); *see also State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007, 1020 (Ariz.1983) (uncertainty as to ultimate fate relevant to establish cruelty); *Dampier v. State*, 245 Ga. 882, 268 S.E.2d 349 (Ga.1980); *Hawkins v. State*, 891 P.2d 586 (Okla.Crim.App.1994) (mental suffering includes uncertainty over one's ultimate fate)."

*State v. Carter*, 988 S.W.2d 145, 150 (Tenn. 1999).

Moreover, this aggravating circumstance has withstood constitutional attacks.

"In *Lindsey v. Thigpen*, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the 'especially heinous, atrocious or cruel' aggravating circumstance because this Court's application of it provided a 'principled way to distinguish' cases in which the death penalty is appropriately imposed from cases in which it is not. *Id.* at 1513, 1515 (upholding our application of Ala.Code 1975, § 13A–5–49(8) and quoting *Godfrey [v. Georgia ]*, 446 U.S. [420,] 431, 100 S.Ct. 1759 (1980) ] ). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A–5–49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined 'especially heinous, atrocious or cruel' to include only 'those conscienceless or pitiless homicides which are *unnecessarily torturous* to the victim.' *Lindsey v. Thigpen*, at 1514 (quoting *Ex parte Kyzer*, 399 So.2d 330, 334 (Ala.1981)) (emphasis added)."

*Ex parte Clark*, 728 So.2d 1126, 1138 (Ala. 1998).

"With respect to Minor's constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance in § 13A–5–49(8), Ala.Code 1975, [that it is unconstitutionally vague and overbroad] this Court has repeatedly upheld that circumstance against similar challenges. See *Duke v. State*, 889 So.2d 1 (Ala. Crim.App.2002); *Ingram v. State*, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000); *Freeman v. State*, 776 So.2d 160 (Ala.Crim.App. 1999), aff'd, 776 So.2d 203 (Ala.2000); *Bui v. State*, 551 So.2d 1094 (Ala.Crim. App.1988), aff'd, 551 So.2d 1125 (Ala. 1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and *Hallford v. State*, 548 So.2d 526 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.1989)."

*Minor v. State*, 914 So.2d 372, 437 (Ala. Crim.App.2004).

In this case, Doris Gilbert and Robert Gilbert, an elderly couple, were viciously stabbed to death in their home. One spouse watched helplessly while the other spouse was stabbed multiple times and ultimately died. Doris Gilbert was stabbed 18 times and Robert Gilbert was stabbed 32 times. The murders in this case, by any definition, were heinous, atrocious, or cruel as compared to other capital murders. This aggravating circumstance was proven beyond a reasonable doubt and was correctly applied in this case. Shaw is due no relief on this claim.

## XIV.

Shaw next argues that his sentence of death must be vacated because, he says, the sentence violates the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). While acknowledging the Alabama Supreme Court's decision in *Ex parte Waldrop*, 859 So.2d 1181 (Ala.2002), Shaw con-

tends that he disagrees with that holding and that it does not comport with the United States Supreme Court's holding in *Ring*. Shaw asserts that since the court released *Ring* a sentence of death is appropriate only when a jury unanimously finds that an aggravating circumstance exists and that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances.

The Alabama Supreme Court addressed this issue in *Waldrop* and stated:

> "Contrary to Waldrop's argument, the weighing process is not a factual determination. In fact, the relative 'weight' of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, 'While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.' *Ford v. Strickland*, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which 'the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.' *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See *Harris v. Alabama*, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (rejecting 'the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required"' (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that

> 'the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer').

> "Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See *California v. Ramos*, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) ('Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.'); *Zant v. Stephens*, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) ('sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does')."

859 So.2d at 1189. For the reasons stated by the Supreme Court in *Waldrop*, Shaw is due no relief on this claim.

In the same section of his brief, Shaw also argues that the Supreme Court's decision in *Waldrop* "eases the State's burden of proving that the death penalty is an appropriate punishment by holding that the jury need not be unaware that its culpability phase finding alone may authorize the trial judge to impose the death penalty in certain cases." (Shaw's brief, pp. 96–97.) Last, he contends that the decision in *Waldrop* undermines the reliability of the sentencing process.

Shaw recognizes that *Waldrop* dictates our result in regard to these claims. This Court is bound by the decisions of the Alabama Supreme Court, § 12–3–16, Ala. Code 1975, and has no authority to modify or reverse that decision. For these reasons, Shaw is due no relief on these claims.

## XV.

■■■ Shaw next argues that his death sentence is unconstitutional because, he says, several of the aggravating circumstances supporting the death sentence overlap with elements of the capital-murder offenses. The circuit court found two aggravating circumstances: (1) that the murders were committed during the course of a burglary, § 13A–5–49(4), Ala.Code 1975; and (2) that two or more persons were killed pursuant to one act or scheme or course of conduct, § 13A–5–49(9), Ala. Code 1975. Specifically, Shaw argues that the use of the underlying felonies as aggravating circumstances resulted in the failure to narrow the class of individuals eligible for the death penalty and renders his death sentence unconstitutional.

The United States Supreme Court in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), in upholding Louisiana's practice of using an element of the capital-murder offense as an aggravating circumstance, stated:

"Here, the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that 'the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.' The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the

elements of the crime does not make this sentence constitutionally infirm."

484 U.S. at 246.

In *Vanpelt v. State,* 74 So.3d 32, 89 (Ala.Crim.App.2009), this Court addressed this issue and stated:

"Contrary to [the appellant's] assertions, there is no constitutional or statutory prohibition against double counting certain circumstances as both an element of the offense and an aggravating circumstance. See § 13A–5–45(e), Ala. Code 1975 (providing that 'any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing'). The United States Supreme Court, the Alabama Supreme Court, and this court have all upheld the practice of double counting. See *Lowenfield v. Phelps,* 484 U.S. 231, 241–46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) ('The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.'); *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) ('The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).'); *Ex parte Kennedy,* 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); *Brown v. State,* 11 So.3d 866 (Ala.Crim. App.2007); *Harris v. State,* 2 So.3d 880 (Ala.Crim.App.2007); *Jones v. State,* 946 So.2d 903, 928 (Ala.Crim.App.2006); *Peraita v. State,* 897 So.2d 1161, 1220–21 (Ala.Crim.App.2003); *Coral v. State,* 628 So.2d 954 (Ala.Crim.App.1992); *Haney v. State,* 603 So.2d 368 (Ala.Crim.App. 1991). Because double counting is constitutionally permitted and statutorily

required, Vanpelt is not entitled to any relief on this issue. § 13A–5–45(e), Ala. Code 1975."

74 So.3d at 89.

Here, there was no unconstitutional double counting when elements of the capital murders—burglary and the death of two or more people—were also used as aggravating circumstances that supported Shaw's sentence of death. For the reasons stated above, Shaw is due no relief on this claim.

## XVI.

Shaw next argues that the prosecutor erred when he made certain arguments in closing at the penalty phase. Specifically, Shaw challenges two arguments made by the prosecutor.

This Court has stated the following when reviewing the propriety of a prosecutor's argument:

" 'The relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. *Duren v. State*, 590 So.2d 360, 364 (Ala. Cr.App.1990), aff'd, 590 So.2d 369 (Ala. 1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992)."

*Simmons v. State*, 797 So.2d 1134, 1162 (Ala.Crim.App.1999).

Moreover, " '[t]his court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' " *Kuenzel v. State*, 577 So.2d 474, 489 (Ala. Crim.App.1990) (quoting *Johnson v. Wainwright*, 778 F.2d 623, 629 n. 6 (11th Cir. 1985)).

We now examine each challenged argument.

## A.

▆▆ Shaw first challenges the following argument:

"[Shaw's] wife was very telling, ladies and gentlemen of the jury, and you saw it yourself. In all of the testimony in the guilt phase of this trial, [Shaw] never once cried a tear. In all of the horrific photographs of Bob and Doris Gilbert brutally slain, laying in that room in their own pools of blood, in all of the horrific photographs of Bob and Doris Gilbert when Dr. Krolikowski was performing the autopsy and going through each of the fifty stab wounds never shed a tear, never shed a tear, didn't care at all about what he had done to Bob and Doris Gilbert. It was only when his wife got on the stand that he shed a tear about her testimony. That is very telling, ladies and gentlemen of the jury, very telling."

(R. 155–56.) Specifically, Shaw argues that the above comments were comments on Shaw's failure to testify and were impermissible and constituted reversible error. Shaw made no objection to the prosecutor's argument; therefore, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

In *Thompson v. State*, 153 So.3d 84 (Ala. Crim.App.2012), we addressed a similar claim and stated:

"In *Hunt v. Commonwealth*, 304 S.W.3d 15 (Ky.2009), the prosecutor commented that Hunt had shown a 'total and complete lack of remorse or regret

over anything that occurred.' In finding no reversible error, the Kentucky Supreme Court stated:

> " 'Rather than a comment on Hunt's silence, we construe the statements as relating to his courtroom demeanor. A prosecutor is entitled to comment on the courtroom demeanor of a defendant. *Woodall v. Commonwealth,* 63 S.W.3d 104, 125 (Ky. 2001). We find no error in the comments cited.'
>
> "304 S.W.3d at 38. 'The conduct of the accused or the accused's demeanor during the trial is a proper subject of comment.' *Wherry v. State,* 402 So.2d 1130, 1133 (Ala.Crim.App.1981). This Court has held that 'remorse is . . . a proper subject of closing arguments.' *Ex parte Loggins,* 771 So.2d 1093, 1101 (Ala. 2000)."

153 So.3d at 175. *See Kelley v. State,* [Ms. CR–10–0642, Sept. 5, 2014] —— So.3d —— (Ala.Crim.App.2014); *White v. State,* 179 So.3d 170 (Ala.Crim.App.2014) (opinion on return to remand). *See also Moffett v. State,* 137 So.3d 247 (Miss.2014) ("The prosecutor's comments about Moffett's demeanor during the trial were made to a jury that had the opportunity to personally view his demeanor for themselves. The jurors had the opportunity to form their own opinions and were not required to rely on the prosecutor's opinions."); *State v. Flippen,* 349 N.C. 264, 276, 506 S.E.2d 702, 710 (1998) ("Remarks relating to a defendant's demeanor are permissible because the defendant's demeanor is 'before the jury at all times.' ").

The prosecutor's arguments were not comments on Shaw's failure to testify but were comments on Shaw's demeanor during the course of the trial. Those remarks were proper and did not constitute error,

much less, plain error. Shaw is due no relief on this claim.

### B.

■ Shaw next argues that the prosecutor misled the jury on the law concerning mitigating circumstances and that the prosecutor's misstatement denied him due process, a fair trial, and an individualized sentencing determination.

The prosecutor argued the following in his closing in the penalty phase:

> "[I] want to tell you what the law says are mitigating circumstances set forth by law that the defendant can claim in a criminal trial, capital murder trial: One, the defendant has no significant history of criminal activity. Two, the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. Number 3, the victim was a participant in the defendant's conduct or consented to it. Number 4, the defendant was an accomplice in the capital murder committed by another person and his participation was relatively minor. Number 5, the defendant acted under duress or under the domination of another person. Number 6, the capacity of the defendant to appreciate the criminality of his conduct to conform his conduct to the requirements of law was substantially impaired. And number 7, the age of the defendant at the time of the crime.
>
> "Now, these are all the ones the law allows, but let's talk about this particular case, which one of these apply or could apply in this particular case."

(R. 1552–53.) There was no objection at the time this argument was made to the jury; therefore, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

This Court has held that a prosecutor's misstatements concerning the weighing of the aggravating and the mitigating circum-

stances did not rise to the level of plain error.

"Whatever misstatements the prosecutor made regarding the weighing of aggravating and mitigating circumstances did not ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' *Vanpelt [v. State]*, 74 So.3d [32] at 90 [ (Ala.Crim.App.2009) ]. The circuit court charged the jury at the penalty phase that what the attorneys said was not evidence. (Vol. XIII, R. 1984–85, 88–92.) Further, the circuit court correctly charged the jury on the weighing of the aggravating circumstances and the mitigating circumstances. (Vol. XIII, R. 1998–99.) Jurors are presumed to follow the trial court's instructions. See *Irvin v. State*, 940 So.2d 331, 352 (Ala.Crim.App.2005) (citing *Taylor v. State*, 666 So.2d 36, 70 (Ala.Crim.App.), on return to remand, 666 So.2d 71 (Ala. Crim.App.1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)). No plain error occurred, and no basis for reversal exists regarding this claim."

*Reynolds v. State*, 114 So.3d 61, 144 (Ala. Crim.App.2010). Many courts have held likewise. See *State v. Taylor*, 362 N.C. 514, 546, 669 S.E.2d 239, 265 (2008) ("[A] prosecutor's misstatement of the law may be cured by the trial court's subsequent correct instruction."); *Cox v. State*, 819 So.2d 705, 718 (Fla.2002) ("[T]he prosecutorial misrepresentation of the law was harmless error, and certainly does not constitute fundamental error."); *State v. Bridgewater*, 823 So.2d 877, 903 (La.2002) ("Misstatements of law by the district attorney during argument do not give rise to reversible error when the trial court properly instructs the jury at the close of the case."); *Holsinger v. State*, 750 N.E.2d 354, 358 (Ind.2001) ("The prosecution did misstate the law by telling the jury that a defendant is not required to give the State any information. But in light of overwhelming evidence of Defendant's guilt, allowing this statement over objection would have constituted harmless error."); *Robbins v. State*, 243 Ga.App. 21, 25, 532 S.E.2d 127, 131 (2000) ("In view of the fact that the trial court properly instructed the jury with regard to the State's burden of proof, we find it unlikely that the jury was either misled or confused by the prosecutor's mistake."); and *Wood v. State*, 959 P.2d 1, 14 (Okla.Crim.App.1998) ("[W]e find the Prosecutor's misstatement to be harmless.").

Although the prosecutor did make a misstatement concerning the law, the circuit court properly charged the jury that it could consider anything presented by Shaw as mitigation. The court further instructed the jury that arguments of counsel were not evidence. For these reasons, we find that the prosecutor's misstatements of the law were not so egregious that they rose to the level of plain error. *See Reynolds v. State, supra.* Shaw is due no relief on this claim.

## XVII.

Shaw next argues that he was improperly sentenced to death because, he says, the circuit court gave an erroneous jury instruction concerning the process of weighing the aggravating and the mitigating circumstances. Specifically, he argues that the circuit court reversed the State's burden of proof.

After the court gave its instructions, the court specifically asked if either the State or defense counsel had any objections. Neither indicated that they did. (R. 1598.) Thus, we review this claim for plain error. *See* Rule 45A, Ala. R.App. P.

The circuit court gave the following instruction:

"Under our law, the determination of whether a defendant should be sentenced to death or to life imprisonment without the possibility of parole depends on several factors. First, you must determine whether any aggravating circumstance exists. If you determine the existence of one or more aggravating circumstance, you will then have to determine whether the aggravating circumstances outweigh any mitigating circumstances.

" . . . .

"All right. The process of weighing aggravating and mitigating circumstances is not a mechanical one. In other words, your weighing of the circumstances is not simply counting up the number of factors on one side versus the other side.

"If the jury determines that one or more aggravating circumstances exist and that they do not outweigh the mitigating circumstances, you shall return a verdict of life imprisonment without parole.

"If the jury determines that one or more aggravating circumstances exist and that they outweigh the mitigating circumstances, if any, they shall return a verdict of death.

"The law of our state recognizes that it is possible, in at least some situations, that one or a few aggravating circumstances might outweigh a large number of mitigating circumstances. The law also recognizes that it is possible, at least in some situations, that a large number of aggravating circumstances might be outweighed by one or a few mitigating circumstances. In other words, the law contemplates that different circumstances may be given different values or weights in determining the jury's recommended sentence in a case, and you, the jury, are to decide what weight or value is to be given to a particular circumstance in determining the sentence in light of all the other circumstances in the case. You must do that in the process of weighing the aggravating circumstances against the mitigating circumstances.

" . . . .

"After full consideration and fair consideration of the evidence, if you are convinced beyond a reasonable doubt of the existence of the aggravating circumstance or circumstances on which I have charged you, and at least ten of you agree that the aggravating circumstance or circumstances outweighs any mitigating circumstance, then your verdict would be for death . . . ."

(R. 1582–97.)

"In setting forth the standard for plain error review of jury instructions, the court in *United States v. Chandler*, 996 F.2d 1073, 1085, 1097 (11th Cir. 1993), cited *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1197–98, 108 L.Ed.2d 316 (1990), for the proposition that 'an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.' "

*Williams v. State*, 710 So.2d 1276, 1306 (Ala.Crim.App.1996).

In *Ex parte Cothren*, 705 So.2d 861 (Ala. 1997), the Alabama Supreme Court considered a similar jury instruction and stated:

"Cothren contends that the following portion of the trial court's instructions constituted reversible error:

" '[T]he law also provides whether death or life imprisonment without parole should be imposed upon the defendant depends upon whether any aggravating circumstances exist and whether any circumstances exist—any mitigating circumstances exist that

outweigh those aggravating circumstances.'

"Cothren correctly argues that Alabama law requires that the jury find the aggravating circumstances to outweigh the mitigating circumstances before it can recommend a death sentence. However, according to Cothren, that portion of the trial court's instructions set out above created an impermissible presumption in favor of a death sentence, a presumption that, he says, he had to attempt to overcome. The State contends that the trial court's instructions, taken as a whole, sufficiently informed the jury that it had to weigh the aggravating and mitigating circumstances and that it had to find that the aggravating circumstances outweighed the mitigating circumstances before it could recommend a death sentence.

"After reviewing the trial court's instructions, we hold that those instructions, taken as a whole, sufficiently informed the jury of the weighing process required under the law."

705 So.2d at 870–71.

Here, the circuit court's instructions, taken as a whole, correctly informed the jury that it could recommend a sentence of death only if the aggravating circumstance or circumstances outweighed the mitigating circumstance or circumstances. There is no "reasonable likelihood that the jury applied the instruction in an improper manner." *See Williams, supra.* Accordingly, we find no plain error, and Shaw is due no relief on this claim.

### Conclusion

We affirm Shaw's two convictions for burglary/murder and one conviction for the murder of two or more people during one scheme or course of conduct. For the reasons stated in Part IX of this opinion, this case is hereby remanded to the Mobile Circuit Court for that court to set aside one of Shaw's two convictions for violating § 13A–5–40(a)(10), Ala.Code 1975. *See Yeomans, supra.* Because we are instructing the circuit court to set aside one of Shaw's capital-murder convictions and because the circuit court specifically referenced four capital-murder convictions in its sentencing order, we further instruct that court to reweigh the aggravating circumstances and the mitigating circumstances pursuant to § 13A–5–47(e), Ala.Code 1975, and to enter a new sentencing order. Due return should be filed in this Court within 60 days from the date of this opinion.

AFFIRMED IN PART, AND REMANDED WITH INSTRUCTIONS.

KELLUM and BURKE, JJ., concur.

WINDOM, P.J., and WELCH, J., concur in part and dissent in part with writing by WINDOM, P.J., which WELCH, J., joins.

WINDOM, Presiding Judge, concurring in part and dissenting in part.

I agree with all aspects of the majority's opinion except the decision to order the circuit court to reconsider Aubrey Lynn Shaw's sentence on remand. Therefore, I respectfully dissent from that part of the opinion.

The majority correctly holds that Shaw's two convictions for murder made capital because "two or more persons were murdered by the defendant by one act or pursuant to one scheme or course of conduct" violate the Double Jeopardy Clause; therefore, one of those convictions must be set aside. § 13A–5–40(a)(10), Ala.Code 1975. The majority's decision, however, incorrectly concludes that "because the circuit court specifically referenced four capital-murder convictions in its sentencing order [and because this Court has ordered that one of those convictions be set aside],

[this Court must] instruct that court to reweigh the aggravating circumstances and the mitigating circumstances pursuant to § 13A–5–47(e), Ala.Code 1975." 207 So.3d at 130. Specifically, I do not believe that the circuit court considered Shaw's two convictions under § 13A–5–40(a)(10), Ala.Code 1975, as two aggravating circumstances under § 13A–5–49(9), Ala.Code 1975 (defining the following aggravating circumstance: "The defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct."). Further, even if the circuit court did consider Shaw's two convictions under § 13A–5–40(a)(10), Ala.Code 1975, as two aggravating circumstances under § 13A–5–49(9), Ala.Code 1975, the "aggravating facts" underlying Shaw's two convictions are the same and support at least one valid aggravating circumstance; therefore, no constitutional error occurred. *Brown v. Sanders,* 546 U.S. 212, 223, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006).

First, I do not believe that the circuit court considered Shaw's two convictions under § 13A–5–40(a)(10), Ala.Code 1975 (murder of two or more people), as two aggravating circumstances under § 13A–5–49(9), Ala.Code 1975 (murder of two or more people). In its sentencing order addressing the aggravating circumstance relating to murder of two or more people, the circuit court explained:

"This statutory aggravator was established as a matter of law through the jury's verdict of guilty on Count Two of each of the indictments. Accordingly, this aggravating circumstance does exist and is considered by the Court."

(C. 55–56.) The circuit court referred to the aggravating circumstance in the singular and found that a single aggravating circumstance existed. Therefore, I do not believe that this Court's reversal of one of Shaw's two convictions for murder of two

or more people requires this Court to order the circuit court to reconsider Shaw's sentence of death.

More importantly, even if the circuit court, or the jury, considered Shaw's two convictions for murder of two or more people as two separate aggravating circumstances under § 13A–5–49(9), Ala. Code 1975, no constitutional error occurred. As the Supreme Court of the United States has explained, "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process unless one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." *Brown v. Sanders,* 546 U.S. at 220. In other words, it is the facts supporting an aggravating circumstance that must be considered in determining whether a sentence of death should be imposed. Thus, if an invalid aggravating circumstance is considered, no constitutional error occurs if the facts supporting that invalid aggravating circumstance could have been considered in support of a valid aggravating circumstance. *Id.* As the Supreme Court explained, consideration of an invalid aggravating circumstance will skew the sentencing scheme "and give rise to constitutional error, only where the jury could not have given *aggravating weight to the same facts* and circumstances under the rubric of some other, valid sentencing factor." *Brown,* 546 U.S. at 221.

Here, the facts supporting Shaw's two convictions for murder of two or more people were the same and supported the at least one valid aggravating circumstance that Shaw intentionally murdered two or more people. Because the aggravating facts supporting both of Shaw's capital-

murder convictions under § 13A–5–40(a)(10), Ala.Code 1975, were properly considered by the circuit court and the jury in determining the proper sentence to impose, the fact that this Court has ordered that one of those convictions be set aside does not render Shaw's sentence or the sentencing process invalid. *See Brown*, 546 U.S. at 221. Accordingly, I do not believe that this Court should require the circuit court to resentence Shaw.

For the foregoing reasons, I respectfully dissent from the portion of the majority's opinion ordering the circuit court to reconsider Shaw's sentence, and I concur in the remaining portions of the opinion.

WELCH, J., concurs.

*On Return to Remand*

JOINER, Judge.

Aubrey Lynn Shaw was convicted of four counts of capital murder for murdering 83–year–old Doris Gilbert and 79–year–old Robert Gilbert during the course of a burglary and by one act or course of conduct, offenses defined as capital in §§ 13A–5–40(a)(4) and 13A–5–40(a)(10), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Shaw be sentenced to death. The circuit court followed the jury's recommendation and sentenced Shaw to death. Shaw appealed to this Court. By opinion dated July 18, 2014, this Court affirmed Shaw's two convictions for murdering Doris and Robert Gilbert during the course of a burglary and one conviction for committing the murders pursuant to one act or course of conduct. *See Shaw v. State*, 207 So.3d 79 (Ala.Crim.App.2014). After finding a double-jeopardy violation, we remanded the case for the circuit court to vacate one of Shaw's convictions under § 13A–5–40(a)(10), Ala.Code 1975. In an abundance of caution, we further instructed the circuit court to reweigh the aggravating circumstances and the mitigating circumstances.

On remand, the circuit court complied with this Court's instructions: it set aside one of Shaw's convictions under § 13A–5–40(a)(10), Ala.Code 1975, and reweighed the aggravating circumstances and the mitigating circumstances. Further, the circuit court reaffirmed Shaw's sentences of death.[1]

As required by § 13A–5–53, Ala. Code 1975, this Court must now address the propriety of Shaw's capital-murder convictions and his sentences of death.

The record reflects that Shaw's sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor. *See* § 13A–5–53(b)(1), Ala.Code 1975.

The circuit court found five aggravating circumstances as set out in § 13A–5–49, Ala.Code 1975: (1) that the murders were committed while Shaw was on probation for two prior convictions for robbery in the third degree, § 13A–5–49(1), Ala.Code 1975; (2) that Shaw had previously been convicted of an offense involving the use or threat of violence to the person, § 13A–5–49(2), Ala.Code 1975; (3) that the murders were committed during the course of a burglary, § 13A–5–49(4), Ala.Code 1975; (4) that the murders were especially heinous, atrocious, or cruel as compared to other capital murders, § 13A–5–49(8), Ala.

---

1. In its order on remand, the circuit court specifically noted this Court's concern that the circuit court had considered Shaw's convictions under § 13A–5–40(a)(10), Ala.Code 1975, as separate and multiple aggravating circumstances; the circuit court, however, stated that it had, in fact, weighed those convictions as a single aggravating circumstance. (Supp. C. 141–42.)

Code 1975; and (5) that the murders were committed by one act or pursuant to one scheme or course of conduct, § 13A–5–49(9), Ala.Code 1975.

The circuit court found no statutory mitigating circumstances. (Supp. C. 153–58.) In regard to the nonstatutory mitigating circumstances, the circuit court found as follows:

"a. *Lack of stable and nurturing environment:* The Court addressed this matter in dealing with the statutory mitigator concerning extreme mental or emotional disturbance. While the evidence is insufficient for Shaw to meet the requisites of that statutory mitigator, the Court finds that the facts and evidence concerning Shaw's upbringing constitute a nonstatutory mitigating circumstance, and the Court assigns it some weight.

"b. *Drug abuse:* The defense urges that [Shaw's] long term abuse of illegal drugs, as well as the use of drugs around the time of the murders, justifies the finding of a nonstatutory mitigating circumstance. This issue was considered above in the discussion of 'impaired capacity.' [2] Some evidence was presented concerning the timing of [Shaw's] drug use prior to the murders and the possible effect on his appreciation of the wrongfulness of his actions. This Court considers Shaw's voluntary long-term use of illegal drugs, along with his use of drugs around the time of the murders, to be a nonstatutory mitigating circumstance and assigns it some weight.

"c. *Mental status:* The Court has considered [Shaw's] mental-health status in conjunction with the statutory mitigating circumstances of 'extreme mental or emotional disturbance' and 'impaired capacity.' The Court found that [Shaw's] mental-health status does not support a finding of the existence of

**2.** In its sentencing order, the circuit court stated the following regarding whether Shaw's "capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired":

"The defense injects this mitigator. The defense presented evidence suggesting that Shaw was on a crack-cocaine binge during the hours leading up to the murders. Heather Shaw, [Shaw's] wife, testified that Shaw was on a cocaine binge for several days leading up to the murders. Tera Orellana saw Shaw in the morning shortly after the murders, and she testified that Shaw appeared to be high on drugs. Ms. Orellana also testified though that, at least by then, Shaw fully appreciated the wrongfulness of his conduct.

"Furthermore, James Gary Watson testified that ... Shaw visited him on the night of the murders looking very 'antsy' and paranoid but not high on drugs. The detectives who questioned Shaw upon his arrest noted that Shaw's eyes were so red that it gave them concern about his health, but the detectives also testified that Shaw did not appear to be under the influence of drugs, or any mind-altering substance. Additionally, in finding [Shaw] guilty of capital murder, the jury necessarily rejected the notion that Shaw was so intoxicated by illegal drugs that he failed to form intent to commit murder.

"This is a close call. The defense injected this statutory mitigator, which placed the burden on the State to disprove it. There is only one living person who knows exactly what happened that night and why. Although the task was difficult, the Court finds that the State met its burden of disproving the factual existence of this statutory mitigating circumstance by a preponderance of the evidence, and the Court gives it no weight. Even if the Court had determined that this statutory mitigating circumstance existed, the Court would have assigned little weight to this circumstance. Voluntary drug use never excuses criminal conduct, and there was no direct evidence presented that at the time of the murders Shaw was so impaired by drugs that he lacked capacity to appreciate the criminality of his conduct or to conform his conduct to the law."

(Supp. C. 156–57.)

either of these statutory mitigating circumstances. However, it is apparent that [Shaw] has suffered from some mental-health problems throughout his life, which have never been treated. The Court finds this to be a nonstatutory mitigating circumstance and assigns it weight.

"d. *Capacity to love and care:* [Shaw's] wife testified that [Shaw] has the capacity to love and care for others. Specifically, she testified that Shaw is a good father to their children, and that [Shaw] is a good husband, father, and person when he is not on drugs. She testified that Shaw helped her become closer to God, and that he has insisted to this day that she and the children keep God in their lives. This Court finds this nonstatutory mitigator does exist and assigns it weight.

"e. *Capacity to conform in a prison environment:* The defense presented evidence that Shaw is capable of conforming in a prison environment for the rest of his life. This Court finds this nonstatutory mitigator does exist and assigns it some weight.

"f. *Mercy:* [Shaw], his attorneys, and family plead for mercy. Those calls for mercy cannot be rebutted by the State. The Court is also mindful of the tragic and irreplaceable loss suffered by the victims' family and friends. However, this nonstatutory mitigator is found to exist and is given some weight."

(Supp. C. 159–61.)

This Court has independently weighed the aggravating circumstances and the mitigating circumstances as required by § 13A–5–53(b)(2), Ala.Code 1975, and we are convinced that death was the appropriate sentence for the homicides of Doris and Robert Gilbert.

Neither are Shaw's sentences disproportionate or excessive compared to penalties imposed in similar capital-murder cases. *See* § 13A–5–53(b)(3), Ala.Code 1975. This Court has repeatedly upheld death sentences for murders committed during the course of a burglary and murders involving the death of two or more persons pursuant to one act. *See, e.g., White v. State,* 179 So.3d 170 (Ala.Crim.App.2013) (burglary/murder); *McCray v. State,* 88 So.3d 1 (Ala.Crim.App.2010) (burglary/murder); *Hall v. State,* 979 So.2d 125 (Ala.Crim.App.2007) (burglary/murder); *Belisle v. State,* 11 So.3d 256 (Ala.Crim.App.2007) (burglary/murder); *Jones v. State,* 987 So.2d 1156 (Ala.Crim.App.2006) (burglary/murder); *Walker v. State,* 932 So.2d 140 (Ala.Crim.App.2004) (burglary/murder). *See also Harris v. State,* 2 So.3d 880 (Ala.Crim.App.2007) (death of two or more persons); *Snyder v. State,* 893 So.2d 488 (Ala.Crim.App.2003) (death of two or more persons).

Last, as required by Rule 45A, Ala. R.App. P., we have searched the entire record for any error that may have affected Shaw's substantial rights and have found none.

Shaw's sentences of death are due to be, and are hereby, affirmed.

AFFIRMED.

WELCH, KELLUM, and BURKE, JJ., concur.

WINDOM, P.J., concurs in the result.